

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-28-2004

# CGB Occupational v. RHA Health Ser Inc

Precedential or Non-Precedential: Precedential

Docket No. 02-4372

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"CGB Occupational v. RHA Health Ser Inc" (2004). *2004 Decisions.* Paper 1038.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1038

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 28, 2004

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 02-4372

———————

CGB OCCUPATIONAL THERAPY, INC.,
d/b/a CGB Rehab Inc.

v.

RHA HEALTH SERVICES INC.;
SYMPHONY HEALTH SERVICES, INC.;
RHA/PENNSYLVANIA NURSING HOMES, INC., d/b/a
Prospect Park Rehabilitation Center, d/b/a Prospect Park
Nursing Center, d/b/a Prospect Park Health and
Rehabilitation Residence;
RHA/PENNSYLVANIA NURSING HOMES, INC., d/b/a
Pembrooke Nursing and Rehabilitation Center, d/b/a
Pembrooke Nursing and Rehabilitation Residence, f/k/a
West Chester Arms Nursing and Rehabilitation Center;
SUNRISE ASSISTED LIVING, INC. aka SUNRISE;
SUNRISE ASSISTED LIVING MANAGEMENT, INC.

Sunrise Assisted Living, Inc. and
Sunrise Assisted Living Management, Inc.,

Appellants

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Dist. Court No. 00-cv-04918)
District Judge: Hon. Clarence C. Newcomer

———————

Argued: September 16, 2003

Before: ALITO, AMBRO and CHERTOFF, *Circuit Judges*

(Filed: January 28, 2004)

Melissa Lang, Esq.
Harvey, Pennington, Cabot,
 Griffith & Renneisen
1835 Market Street
Eleven Penn Center, 29th Floor
Philadelphia, PA 19103

C. William Groscup (Argued)
Watt, Tieder, Hoffar & Fitzgerald
7929 Westpark Drive
Suite 400
McLean, VA 22102

   Counsel for Appellants

David G. Concannon, Esq. (Argued)
Law Offices of David G. Concannon
150 Strafford Avenue
Building One, Suite 112
Wayne, PA 19087

   Counsel for Appellee
   CGB Occupational Therapy, Inc.

---

## OPINION OF THE COURT

---

CHERTOFF, *Circuit Judge*:

This case concerns various Pennsylvania state law claims arising out of a business dispute. It reaches us after a jury returned a verdict in appellee's favor and the District Court denied appellant's request for post-trial relief. Among other things, we are obliged to interpret some of the contours of the tort of interference with contractual relations under Pennsylvania law.

Jurisdiction in the District Court was based on 28 U.S.C. § 1332(a), governing an action between diverse citizens involving a claim for more than $75,000. We have jurisdiction pursuant to 28 U.S.C. § 1291, as this is an appeal from a final order of the District Court. We will affirm in part and reverse in part, remanding for a re-determination of punitive damages and further action in conformity with this opinion.

## I.

This case has been characterized by its contentious history. Not surprisingly, the relevant facts are somewhat in dispute. As both the party prevailing before the jury and the non-movant in the post-trial motion for judgment as a matter of law, appellee is entitled to have all reasonable inferences drawn in its favor. *See Johnson v. Campbell*, 332 F.3d 199, 202, 204 (3d Cir. 2003); *Becton Dickinson and Co. v. Wolckenhauer*, 215 F.3d 340, 343 (3d Cir. 2000). We summarize the facts accordingly.

## A.

Plaintiff/appellee CGB Occupational Therapy, Inc. ("CGB") is a provider of rehabilitation therapy services in long-term care and assisted-living facilities. During the relevant time period, CGB contracted with nursing home facilities for the provision of therapeutic services and, once under contract, provided each facility with trained therapists and technicians.

Defendant RHA/Pennsylvania, Inc. ("RHA/Pennsylvania") owned two nursing home facilities, one in West Chester, Pennsylvania ("Pembrooke facility") and one in Prospect Park, Pennsylvania ("Prospect facility").[1] At all times relevant to this litigation, those facilities were managed by one or more of appellants Sunrise Assisted Living, Inc. ("Sunrise Assisted"); Sunrise Assisted Living Management, Inc. ("Sunrise Management," collectively with Sunrise Assisted, "Sunrise"); or their predecessor entities.[2] The management agreement provided for Sunrise to be

---

1. Neither the role of defendant RHA Health Services, Inc. ("RHA Health") nor the distinction between RHA Health and RHA/Pennsylvania is clear from the record. While various parts of the record seem to treat these separately incorporated entities synonymously, no pleading asserted (nor did the District Court conclude) that the corporate wall separating them is a meaningless distinction or that the two entities are "alter-egos" of each other. The matter is irrelevant for purposes of this appeal, however.

2. CGB's amended complaint asserted that the distinction between Sunrise Assisted and Sunrise Management was a fiction. The jury agreed, and Sunrise has not challenged that determination on appeal. We express no opinion on the subject.

RHA/Pennsylvania's "managing agent." The agreement also stated that:

> 1.04 . . . Manager [Sunrise] shall on behalf of Owner [RHA/Pennsylvania] manage all aspects of the operation of the Facilities . . . . In connection with its management of the operations of the Facilities, Manager . . . shall use its best efforts to perform the following services . . . :
>
> (6) . . . contract for all necessary services for the account of Owner, except that . . . any service contract providing for payments in excess of $10,000 shall be subject to prior approval of Owner, and monitor the performance of the suppliers of all contracted services and, in Owner's name, terminate such contracts when deemed by Manager to be in the best interests of Owner; . . . .

A. 2883-85. A further provision stated:

> (15) Manager shall be responsible for the coordination of such ancillary services, including but not limited to speech therapy, occupational therapy, inhalation therapy, physical therapy, and rental of equipment, as Manager may deem reasonable, necessary or desirable in connection with the operation of the Facilities and use such consultants in connection therewith as manager shall elect; . . . .

A. 2886.

On January 1, 1995, CGB entered into a contract with RHA/Pennsylvania to provide therapy services (physical, occupational, and speech) to the Pembrooke facility. A similar agreement was executed on October 7, 1996, whereby CGB would provide therapy services to the Prospect facility. The agreements each contained an "anti-raiding" clause, promising that in the event that CGB were terminated as the provider of therapy services, the Pembrooke and Prospect facilities would not seek to employ or contract with CGB's therapists (who were at-will, independent contractors) for a period of twelve months. The agreement with the Prospect facility also stated that the

CGB contract could be terminated for cause only upon ninety days written notification specifying the cause upon which termination was based. Further, the contract provided CGB an opportunity to cure any defects in its performance. If cured before the termination date, the contract was to continue "in full force and effect."

Changes to the federal Medicare program in 1998 altered the way RHA/Pennsylvania was reimbursed for therapy services provided to residents. The changes made it difficult for RHA/Pennsylvania and its Pembrooke and Prospect facilities to pay CGB, and the facilities stopped paying CGB on June 30, 1998. That same day, Sunrise sent CGB ninety-day termination notices for both the Pembrooke and Prospect facilities. Each letter stated that the termination was to be effective on September 30, 1998 and was due to the facilities' evaluation of CGB's services "in light of changes in the [Medicare reimbursement] system . . . ."

Under an agreement executed by Sunrise on behalf of RHA/Pennsylvania on July 1, 1998, Symphony Health Services, Inc. ("Symphony") was retained as the new therapy service provider at the Prospect facility effective October 1, 1998.[3] A similar agreement was executed between Sunrise and Symphony on July 10, 1998 for provision of services to the Pembrooke facility.

On July 31, 1998, despite a direct admonition by RHA/Pennsylvania against doing so, Sunrise's Prospect Park Administrator, Ms. Marjorie Tomes, met with certain CGB therapists. During that meeting, Ms. Tomes informed the therapists that CGB had been terminated, that Symphony would be the replacement therapy contractor, and that there was the possibility of employment opportunities with Symphony. Ms. Tomes also polled the therapists for their interest in pursuing employment with Symphony and wrote down the names of those who replied in the affirmative.

On August 3, 1998, CGB's lawyer sent a letter to Ms. Tomes addressing her meeting with the therapists. The

---

3. The agreement was signed by a senior Vice President for Symphony in late June of 1998, but was not signed by Sunrise until July 1, 1998.

letter acknowledged the fact of Ms. Tomes's meeting with CGB's therapists and referred to her actions as "appear[ing]" to have constituted tortious interference.

Also in August, RHA/Pennsylvania, through its lawyer, sent a letter to CGB restating the reasons for termination and stating that the decision to terminate was irrevocable. The letter was in response to a series of letters and telephone messages from CGB's president to various RHA/Pennsylvania and Sunrise executives seeking a specific statement of "cause" for termination, opportunity to cure, and reinstatement of the contract. On September 28, 1998, CGB sent a final letter to Sunrise, stating that it had yet to receive notice of adequate "cause" for termination. The letter also attempted to resolve the therapist recruitment issue.[4]

At various times in September 1998, several of CGB's therapists signed contracts with Symphony. The therapists continued working for CGB, however, until Symphony officially began providing services at the Pembrooke and Prospect facilities. On September 30, 1998, RHA/Pennsylvania terminated CGB. On October 1, 1998, Symphony began providing therapy services at the Pembrooke and Prospect facilities. On that same day, those among CGB's therapists that had signed contracts with Symphony officially left their posts as at-will therapists with CGB and began working for Symphony.

## B.

Two years—less two days—later, on September 28, 2000, CGB, a citizen of Pennsylvania, sued Sunrise Assisted, a Delaware corporation having its principal place of business in Virginia; RHA Health, a North Carolina non-profit corporation having its principal place of business in Georgia; Symphony, a Delaware corporation having its principal place of business in Maryland;[5] and

---

4. Additional letters were sent by CGB to Symphony on September 16, 1998 and September 30, 1998. In the interim, CGB and Symphony attempted, without success, to resolve the dispute over Symphony's recruitment of CGB's therapists.

5. This Circuit employs the "center of corporate activities" test to determine a corporation's principal place of business. *See Kelly v. United*

RHA/Pennsylvania, a Georgia corporation.[6] On December

*States Steel Corp.*, 284 F.2d 850, 854 (3d Cir. 1960); *Grand Union Supermarkets of the Virgin Islands, Inc. v. H.E. Lockhart Mgmt., Inc.*, 316 F.3d 408, 410 (3d Cir. 2003). CGB's complaint and amended complaint allege "corporate offices" for defendants Symphony, Sunrise Assisted, Sunrise Management, and RHA Health. For purposes of this appeal, we will accept that pleading as an adequate, and accurate, pleading of the principal places of business of these defendants.

6. CGB named RHA/Pennsylvania in the suit as the entity doing business as Prospect Park Rehabilitation Center (also doing business as Prospect Park Nursing Center and Prospect Park Health and Rehabilitation Residence) and separately as the entity doing business as Pembrooke Nursing and Rehabilitation Center (also doing business as Pembrooke Nursing and Rehabilitation Residence, which was formerly known as West Chester Arms Nursing and Rehabilitation Center).

No pleading in this case alleges a principal place of business for defendant RHA/Pennsylvania. The record available to us strongly suggests that RHA/Pennsylvania would be deemed to be a citizen of Pennsylvania under this Circuit's "center of corporate activities" test. *See Kelly*, 284 F.2d at 854. As such, the requirement of complete diversity, which is ordinarily measured at the time the action was filed, was likely lacking and the District Court was probably without subject matter jurisdiction to entertain the case. *See Grand Union*, 316 F.3d at 410. But several courts have observed that "[w]here the case proceeds to trial and judgment, issues of judicial economy prevail," indicating that courts should strive to cure jurisdictional defects, rather than dismiss for want of jurisdiction, in cases that have already proceeded to trial and judgment. *See Caterpillar Inc. v. Lewis*, 519 U.S. 61, 75 (1996); *Knop v. McMahan*, 872 F.2d 1132, 1139 (3d Cir. 1989); *United Republic Ins. Co., in Receivership v. Chase Manhattan Bank*, 315 F.3d 168, 169 (2d Cir. 2003). Moreover, it is well established that courts, both district and circuit alike, have the power under Fed. R. Civ. P. 21 to dismiss dispensable parties to the suit in order to preserve diversity. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 837-38 (1989). While it certainly cannot be contended that RHA/Pennsylvania was a dispensable party, CGB's claims against RHA/Pennsylvania were dismissed with prejudice on May 22, 2001, when the parties settled their dispute. Thus, the jurisdictional defect in the case with respect to RHA/Pennsylvania was cured, and the case proceeded to trial and to judgment in the presence of complete diversity.

We should not need to underscore the importance of adequately pleading and proving diversity. CGB's claims were rescued from a jurisdictional precipice when it settled and dismissed its claims against RHA/Pennsylvania, and the case went to trial without challenge to the District Court's jurisdiction.

13, 2001, pursuant to leave granted by the District Court, CGB filed an amended complaint adding Sunrise Management, a Virginia corporation having its principal place of business in Virginia. CGB brought suit in the Eastern District of Pennsylvania, based on diversity jurisdiction, alleging tortious interference with CGB's contractual relations with RHA/Pennsylvania; tortious interference with CGB's relationship with its therapists; breach of contract; and conversion. In addition, CGB sought to pierce the corporate veil separating Sunrise Assisted from Sunrise Management, its wholly-owned subsidiary, asserting that any distinction between the two was a fiction.

By the time the case was tried over a year later, the only parties adverse to CGB in the District Court case were the Sunrise defendants.[7] The case was tried to a jury from June 10, 2002 to June 13, 2002. The jury unanimously found that Sunrise tortiously interfered with the contracts between CGB and the Pembrooke and Prospect facilities. The verdict returned compensatory damages for that interference in the amount of $576,000. The jury's verdict also specified that each of the Sunrise defendants tortiously interfered with the contracts between CGB and CGB's own therapists. The verdict returned compensation for that interference in the amount of $109,000. The jury awarded CGB punitive damages in the amount of $1,300,000, but the verdict form did not specify how the punitive damages award was allocated between the two instances of interference.

On June 24, 2002, Sunrise moved for post-trial relief. Sunrise requested that the District Court enter judgment as

---

7. On February 9, 2001, the District Court noted a suggestion of bankruptcy by defendant Symphony. On May 22, 2001, CGB settled with RHA Health and RHA/Pennsylvania and its claims against the two RHA defendants were dismissed with prejudice. On May 25, 2001, the District Court noted a suggestion of bankruptcy by the two RHA defendants.

The Sunrise defendants' second amended answer had asserted a cross-claim against RHA Health. That claim was stayed when RHA Health entered bankruptcy.

a matter of law on its behalf, notwithstanding the jury verdicts. Sunrise alternatively contended that it was entitled to a new trial due to alleged juror misconduct and the District Court's denial of its motion for a continuance. The District Court denied Sunrise's post-trial motions and entered a final order on November 6, 2002. Sunrise timely appealed.

On appeal, Sunrise contends that (1) the case should have been dismissed because the applicable two year statute of limitations ran before CGB filed the action;[8] (2) the District Court should have granted its post-trial motion for judgment as a matter of law because CGB failed to establish several necessary elements of both claims of tortious interference; (3) the jury's verdict with respect to punitive damages should be overturned because without the tortious interference claims CGB's contentions are reduced to mere breach of contract claims, for which punitive damages are not available; (4) it is entitled to a new trial because the District Court wrongly refused to grant its request for a continuance in light of the unavailability of one of its witnesses; and (5) the District Court erred when it declined to grant a new trial in light of allegations that one juror violated court instructions by relying on information outside the record during deliberations.

We exercise plenary review over a district court's denial of judgment as a matter of law. *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003). In conducting our review, we apply Pennsylvania law, *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), and ask whether, "viewing the evidence in the light most favorable to the non-movant and giving it

---

8. On July 9, 2001, the Sunrise defendants moved for summary judgment asserting, *inter alia*, that CGB's claims were barred by the statute of limitations. Initially, the District Court granted that motion. *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 00-cv-04918, Order Dated August 16, 2001. Upon CGB's motion for reconsideration, however, the District Court reversed its position, finding that the limitations period had not run as of the filing of the action. *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 00-cv-04918, Order Dated December 5, 2001. Sunrise renewed its plea for relief based on the statute of limitations in its motion for post-trial relief.

the advantage of every fair and reasonable inference, there is [ ]sufficient evidence from which a jury reasonably could find liability." *W.V. Realty, Inc. v. Northern Ins. Co. of New York*, 334 F.3d 306, 311 (3d Cir. 2003). "We afford de novo review to the district court's conclusions of law, but review factual findings to determine whether the evidence and justifiable inferences most favorable to [the non-movant] afford any rational basis for the verdict." *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir. 1995) (internal quotations and citations omitted). Although judgment as a matter of law should be granted sparingly, more than a scintilla of evidence is needed to sustain a verdict. Accordingly, "we will grant [judgment as a matter of law] where the record is critically deficient of the minimum quantum of evidence in support of the verdict." *Johnson*, 332 F.3d at 204 (internal quotations and citations omitted). *See also Foster v. National Fuel Gas Co.*, 316 F.3d 424, 428 (3d Cir. 2003).

## II.

Pennsylvania courts apply the two year statute of limitations of 42 Pa. C.S.A. § 5524(3) to tortious interference with contractual relations claims. *See, e.g.*, *Bednar v. Marino*, 646 A.2d 573, 577 (Pa. Super. Ct. 1994). The statute of limitations begins to run when the underlying cause of action accrues. *Bohus v. Beloff*, 950 F.2d 919 (3d Cir. 1991) (citing *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468 (Pa. 1983)).

According to Sunrise, CBG's action was untimely because under Pennsylvania law the appropriate accrual date for tortious interference claims is the date on which the tort victim receives notice of the allegedly interfering conduct. Because CGB was notified of RHA/Pennsylvania's intent to terminate the therapy contract and of Ms. Tomes's recruiting conversation with CGB's therapists before September 28, 1998 (more than two years prior to the filing of the action), Sunrise argues, CGB's claims are beyond the limitations period. Sunrise dismisses the fact that the contract at issue and the at-will employment relationships were not actually terminated until September 30, 1998.

The Pennsylvania Supreme Court and this Court have repeatedly admonished, however, that a statute of limitations begins to run only once a plaintiff can assert and maintain an action. *See, e.g.*, *Pocono Int'l Raceway*, 468 A.2d 471; *Bohus*, 950 F.2d at 924. In other words, "[a] claim under Pennsylvania law accrues at 'the occurrence of the final significant event necessary to make the claim suable.'" *Barnes v. American Tobacco Co.*, 161 F.3d 127, 136 (3d Cir. 1998) (internal citation omitted).

Under Pennsylvania law, a cause of action for tortious interference with contractual relations has the following elements:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Crivelli v. General Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000); *see also Pawlowski v. Smorto*, 588 A.2d 36, 39-40 (Pa. Super. Ct. 1991). Thus a tortious interference claim does not accrue until, at least, the plaintiff suffers injury (i.e., "actual legal damage") as a result of the defendant's conduct.

Here, CGB did not suffer "actual legal damage" until the termination of its contract with RHA/Pennsylvania became effective on September 30, 1998. Even though the allegedly interfering acts were launched before that date— RHA/Pennsylvania notified CGB of its intent to terminate the contract on June 30, 1998, for example—the tort was not consummated until the contract was terminated on September 30, 1998 and legal damage was sustained. Until that time, the existing contract was in full force and effect, and any termination was revocable.

Likewise, CGB did not suffer legal damage when Sunrise met with CGB's therapists and encouraged them to leave CGB to join Symphony. That certain of CGB's at-will

therapists subjectively decided to seek other employment did not legally damage CGB. It was only their departure from the rolls of CGB that occasioned legal damage. And until September 30, 1998, there was no exodus of therapists from CGB.

The cases cited by Sunrise to support its position that the mere notice of termination triggered the claim and the limitations period are inapposite. They flow from the so-called "discovery rule," whereby the "inability of the injured, despite the exercise of due diligence, to know of the injury or its cause" tolls the running of the statute of limitations "until such time as the plaintiff discovers, or reasonably should have discovered" the injury. *Pocono Int'l Raceway*, 468 A.2d at 471. But Sunrise attempts to take that unremarkable proposition—that the statute of limitations should be *postponed* where the victim is unaware of the injury—and reverse it, so as to mandate that the statute of limitations *accelerates* when the victim becomes aware that he will suffer injury in the future. That is logically fallacious. The "discovery rule" has nothing to do with this case.[9]

## III.

Sunrise contends that (1) CGB did not establish an actual injury in fact as a result of Sunrise's alleged interference with the contract between CGB and RHA/Pennsylvania; (2) Sunrise's termination and replacement of CGB as therapy provider was within the scope of its authority as RHA/Pennsylvania's agent and therefore privileged against a claim of tortious interference; and (3) CGB failed to prove that Sunrise acted with tortiously culpable intent in recruiting CGB's therapists.

We can quickly dispose of Sunrise's first contention—we agree with the District Court and find that there was

_____

9. The situation in this case is like one person telling another that, in three months, he intends to trespass. The tort of trespass has not occurred until the victim's property is entered by the tortfeasor. That the victim was informed in advance of the inevitable does not alter the accrual of his damages action for trespass.

adequate evidence that CGB sustained actual injury in fact as a result of the allegedly interfering acts.[10] Sunrise's remaining two arguments require further analysis.

**A.**

As noted above, in order to make out a claim of tortious interference with contractual relations, a plaintiff must show "the absence of privilege or justification on the part of the defendant." *Crivelli*, 215 F.3d at 394. The actions of a principal's agent are afforded a qualified privilege from liability for tortious interference with the principal's contract. *See Maier v. Maretti*, 671 A.2d 701, 707 (Pa. Super. Ct. 1995); *Daniel Adams Assoc. v. Rimbach Pub., Inc.*, 519 A.2d 997, 1000 (Pa. Super. Ct. 1987); *Laird v. Clearfield & Mahoning R.R.*, 59 Pa. D. & C.4th 556, 562 (Court of Common Pleas, Clearfield County 2001); *see also Labalokie v. Capitol Area Intermediate Unit*, 926 F. Supp. 503, 509 (M.D. Pa. 1996).

The reason for this privilege is that holding an agent liable would be like holding the principal itself liable for the tort of interfering with its own contract, instead of holding the principal liable for breach of contract. The agent's privilege is qualified, however, because it applies only when the agent is acting within the scope of its authority. *Maier*, 671 A.2d at 707; *Daniel Adams*, 519 A.2d at 1000; *Labalokie*, 926 F. Supp. at 509. Conversely, an agent may be liable for tortious interference, just as if the agent were an outside third party, if the allegedly interfering acts were conducted outside the scope of the agent's authority. *Labalokie*, 926 F. Supp. at 509.

At trial and in this Court, CGB argued that Sunrise acted

---

10. Sunrise argues that CGB could not have proven legal damage for its termination because as of June 30, 1998, CGB was not being paid by RHA/Pennsylvania for its services and therefore was operating its therapy contract at an economic loss. So, Sunrise contends, any interference with the contract actually saved CGB from losing more money. We find no merit to this argument. Legal damage occurs through loss of a legal right to which one is entitled, even if that right is a claim for payment, rather than the payment itself.

outside the scope of its authority in interfering in CGB's contract with RHA/Pennsylvania in three ways.[11]

*First*, CGB asserts that Sunrise exceeded its authority when it recommended that RHA/Pennsylvania terminate CGB as therapy provider. CGB argues that RHA/Pennsylvania expressly authorized Sunrise to do only two things: (1) physically send the termination letters to CGB; and (2) discuss the termination letters with CGB's president before those letters were sent. CGB contends, therefore, that, unless Sunrise received direct and explicit authorization from RHA/Pennsylvania to recommend termination of the CGB contract, Sunrise's actions exceeded the scope of its authority.

CGB's claim rests on an overly restrictive reading of Sunrise's authority as an agent of RHA/Pennsylvania. The agreement between Sunrise and RHA/Pennsylvania — which, as CGB concedes, governs the scope of Sunrise's agency authority — provided as follows:

> Manager shall be responsible for the coordination of . . . physical therapy, . . . and use such consultants in connection therewith as manager shall elect.

> Manager shall on behalf of Owner . . . monitor the performance of the suppliers of all contracted services and, *in Owner's name, terminate such contracts* when deemed by Manager to be in the best interests of Owner; . . . .

A. 2885-86 (emphasis added). This plain language unequivocally granted Sunrise the express authority to terminate therapy contracts on behalf of RHA/Pennsylvania without prior approval where termination is in

---

11. The parties do not dispute that an agency relationship existed between RHA/Pennsylvania and Sunrise; the agreement between RHA/Pennsylvania and Sunrise makes as much clear. *Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000) ("[T]he three basic elements of agency are: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.") (internal quotations omitted). They only dispute the scope of Sunrise's authority as RHA/Pennsylvania's agent.

RHA/Pennsylvania's interest. It is absurd to suggest that the management agreement provided Sunrise the power to unilaterally terminate, but not the implicit authority to recommend termination. An agent is entitled to act under implicit, as well as express, authority. *See Bolus v. United Penn Bank*, 525 A.2d 1215, 1221 (Pa. Super. Ct. 1987); *see also* Restatement (Second) of Agency § 7 cmt. c (1958). Implied authority, under Pennsylvania law, is "authority to bind the principal to those acts of the agent that are necessary, proper and usual in the exercise of the agent's express authority." *Bolus*, 525 A.2d at 1221. Here, the authority to recommend termination was surely "necessary, proper and usual" in the exercise of the express authority to terminate.

Furthermore, the agreement also imposed on Sunrise an affirmative duty to "be responsible for the coordination of . . . physical therapy" and "monitor the performance of the suppliers of all contracted services." A. 2885-86. Implicit in Sunrise's express authority to coordinate physical therapy and monitor suppliers' performance is the authority to recommend the termination of therapy contractors if Sunrise felt termination to be in RHA/Pennsylvania's interest. Had Sunrise failed to do so, it would likely have violated its fiduciary obligations to its principal, RHA/Pennsylvania.

CGB could only rebut Sunrise's explicit and implicit authority to terminate by presenting some evidence that Sunrise was acting for an interest adverse to its principal's. CGB did not do so. We must conclude that Sunrise was privileged when it recommended to RHA/Pennsylvania that CGB be terminated.

*Second*, CGB argues that Sunrise acted outside its authority because it did not allow CGB an opportunity to cure its performance. To support its contention, CGB asserts that RHA/Pennsylvania specifically directed Sunrise to provide CGB with an opportunity to cure any failure of performance, and that Sunrise failed to comply. Appellee's Br. at 36. CGB concludes that by failing to follow RHA/Pennsylvania's express mandate, Sunrise acted outside the scope of its authority.

An agent's disregard of his principal's instructions does not necessarily place his actions outside the scope of his authority. *See* Restatement (Second) of Agency § 230.[12] But we need not decide in this case whether deviation from a principal's instructions can rise to the degree that actually exceeds the scope of an agent's authority. For here, there is simply no evidence Sunrise violated a specific instruction from RHA/Pennsylvania to provide CGB with an opportunity to cure. All RHA/Pennsylvania did instruct was that Ms. Tomes "handle [the termination of CGB] appropriately." A. 2216. Nothing in the record establishes that Ms. Tomes or any other member of Sunrise was specifically directed, by RHA/Pennsylvania's John West or by anyone else, to provide CGB an opportunity to cure. Absent such a direction, the instruction to "handle" the termination "appropriately" actually recapitulates the delegation to Sunrise of general agency authority to "manage all aspects of the operation of the Facilities . . ." and "terminate such contracts when deemed by Manager to be in the best interests of Owner . . . ."[13] A. 2883-85.

*Third*, CGB asserts that Sunrise exceeded the scope of its agency when it signed two contracts with Symphony as a replacement therapy contracting company. CGB highlights portions of the management agreement that require RHA/Pennsylvania's approval if Sunrise seeks to bind RHA/Pennsylvania to new contracts for more than $10,000.

To the extent that CGB complains that Sunrise's *negotiation* of the Symphony contracts constituted action outside the scope of its authority, CGB is again defeated by the language of the agency agreement itself. The agreement grants Sunrise the broad authority to "contract for all

12. Comment b of section 230 goes further, stating: "A master cannot direct a servant to accomplish a result and anticipate that he will always use the means which [the principal] directs . . . ." *Id.* at cmt. b.

13. What the record does make clear, however, is that CGB *was* given an opportunity to cure by RHA/Pennsylvania directly. RHA/Pennsylvania's John West testified that he, RHA/Pennsylvania's counsel, and CGB's Cindy Brillman conducted negotiations on several occasions regarding CGB's ability to cure. Presumably, this fulfilled CGB's contractual right to an opportunity to cure. Significantly, Sunrise was not part of this attempted "cure" process.

necessary services for the account of Owner," with the only limitation being that "any service contract providing for payments in excess of $10,000 shall be subject to prior approval of Owner . . . ." A. 2883. The quoted language authorized Sunrise to negotiate for a replacement for CGB, withholding only RHA/Pennsylvania's final approval authority for the new contracts.[14]

On the other hand, insofar as Sunrise actually signed the Symphony contracts, CGB is correct that Sunrise exceeded its authority. But Sunrise's execution of the new contracts did not amount to interference with the separate contracts between CGB and RHA/Pennsylvania. Under its management contract with RHA/Pennsylvania, Sunrise had the unrestricted authority to terminate CGB, which was separate and distinct from Sunrise's authority to negotiate new contracts. A. 2884-85 at item (6). The only action by Sunrise arguably not within the scope of any authority was the actual *signing* of the new contracts with Symphony. If Sunrise was acting outside the scope of its authority in executing the new agreements, that fact does not vitiate its distinct authority to terminate the former agreements. Moreover, RHA/Pennsylvania later approved the Symphony contracts, thereby ratifying Sunrise's signature. And, most important, Sunrise's signing of the new contracts did not cause CGB's termination. Sunrise's execution of the contract for CGB's replacement is simply legally irrelevant to its authority to terminate CGB.

The verdict on this claim must therefore be reversed.

### B.

Sunrise contends that CGB failed to prove that Sunrise acted with tortiously culpable intent when it recruited CGB's therapists for CGB's replacement therapy provider.

CGB's claim, of course, asserts that Sunrise interfered in the relationship between CGB and the CGB at-will

---

14. It seems to us that the interest this clause was intended to protect was that of the principal, preventing Sunrise from obligating its principal to a major and disadvantageous contract without RHA/Pennsylvania's prior approval.

employees. Therefore, no issue of agency privilege arises because Sunrise was not CGB's agent. The question presented, instead, is whether intermeddling by a third party (Sunrise) in the relationship between an employer and its at-will employees is an actionable tort. In Pennsylvania:

> Offering employment to another company's at-will employee is not actionable in and of itself. *Albee Homes, Inc. v. Caddie Homes, Inc.*, 207 A.2d 768, 771 (Pa. 1965). However, systematically inducing employees to leave their present employment is actionable 'when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employees.' *Id.*, at 771 (quoting *Morgan's Home Equipment Corp. v. Martucci*, 136 A.2d 838, 847 (Pa. 1957)). Further, when the inducement is made for the purpose of having the employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection. *Albee Homes*, 207 A.2d at 771 (citation omitted).

*Reading Radio, Inc. v. Fink*, 833 A.2d 199, 212 (Pa. Super. Ct. 2003). Additionally, Section 768 of the Second Restatement of Torts states, in relevant part:

> (1) One who intentionally causes a third person . . . not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> > (a) the relation concerns a matter involved in the competition between the actor and the other and
> >
> > (b) the actor does not employ wrongful means and
> >
> > (c) his action does not create or continue an unlawful restraint of trade and
> >
> > (d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) of Torts § 768 (1979). Thus, with respect to Sunrise's interference with CGB's at-will therapists, the issue is not whether Sunrise's actions were

outside the scope of its authority as RHA/Pennsylvania's agent, but rather whether its actions were "wrongful."

In defining "wrongful means," the comment to Section 768 provides: "[t]he predatory means discussed in § 767, Comment c, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section." *Id.* at cmt. e. "[C]ourts, relying partly on [Comment e of section 768], have interpreted the wrongful means element of § 768 to require independently actionable conduct on the part of the defendant." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 531 (3d Cir. 1998) (citing *DP-Tek, Inc. v. AT&T Global Information Solutions Co.*, 100 F.3d 828, 833-35 (10th Cir. 1996)). "Under this standard, wrongful means are those that are themselves capable of forming the basis of liability for the defendant." *Id.* In *National Data Payment Systems v. Meridian Bank*, 212 F.3d 849, 857 (3d Cir. 2000), we recognized that the Pennsylvania courts have adopted the approach set forth in Section 768 of the Second Restatement of Torts. We noted that the Pennsylvania courts have yet to adopt a definition for "wrongful means," but predicted that the Pennsylvania courts would adopt a meaning that included conduct that was "independently actionable." *See id.* at 858. The Pennsylvania courts have yet to disagree.

Here, Sunrise breached its fiduciary duty to RHA/Pennsylvania when it disobeyed RHA/Pennsylvania's direct order not to recruit CGB's at-will therapists. That breach of fiduciary duty is independently actionable conduct, although the cause of action would belong to the principal — RHA/Pennsylvania — and not a third party — CGB. But that does not matter. Even though CGB has no standing to sue Sunrise for Sunrise's breach of fiduciary duty to RHA/Pennsylvania, Sunrise's breach still meets the test of conduct that is "independently actionable." Conduct that is independently actionable by anyone is sufficiently "wrongful" to satisfy the requirements of the tort of interference.

We so held in *National Data*. In that case, National Data Payment Systems, Inc. (NDPS) sued Meridian Bank and CoreStates Financial Group for interference with, and

breach of, a contract for NDPS to purchase Meridian's merchant credit card business. *Id.* at 851. The action arose when Meridian repudiated the deal with NDPS after their negotiation contract expired, and then sold the same merchant credit card business to CoreStates. *Id.* In part, Meridian based its decision to sell to CoreStates, rather than NDPS, on statements made by CoreStates to Meridian regarding the prospective depth and strength of CoreStates's merchant credit card business. *Id.* at 852-53. NDPS alleged that CoreStates's statements were fraudulent and that its actions constituted interference. *Id.* at 858.

We first determined that the lapsed contract to negotiate had become a contract terminable at-will. *National Data*, 212 F.3d at 857. We then applied Restatement section 768 as adopted by the Pennsylvania courts, and concluded that the Pennsylvania courts would adopt a view of "wrongful conduct" that included independently actionable conduct. *Id.* at 857-58. Ultimately, we weighed CoreStates's allegedly fraudulent statement to Meridian to determine whether it was independently actionable and therefore "wrongful," thus exposing CoreStates to liability to NDPS for interference with the at-will contract between NDPS and Meridian. *Id.* at 858. To be sure, we determined that CoreStates's statements did not meet the requirements of Pennsylvania's tort of fraud. But implicit in our analysis was the understanding that a finding of fraudulent statements by CoreStates to Meridian would be sufficient wrongful conduct to sustain a tortious interference action by a third-party, NDPS. *Id.* In short, we interpret the "wrongful means" test to be satisfied by conduct sufficiently wrongful to be actionable by someone, even if not by the party claiming tortious interference.[15]

---

15. This view of independently actionable conduct makes sense under the approach to interference with an at-will contract set forth in Restatement section 768. The "independent actionability" test for improper means is based, in part, on Comment e of Section 768's explication of "wrongful means," but none of the "means" enumerated in Comment e necessarily requires that the party seeking redress for the interference also be entitled to sue over the underlying wrongful conduct. *See* Restatement (Second) Torts § 768 cmt. e.

Sunrise's recruitment of CGB's at-will therapists was in breach of Sunrise's fiduciary duty to RHA/Pennsylvania and independently actionable by RHA/Pennsylvania. Accordingly, it was wrongful within the meaning of Restatement Section 768. With clean hands, Sunrise may have been entitled to approach CGB's at-will therapists. But when Sunrise breached the fiduciary duty it owed to RHA/Pennsylvania in order to do so, it became subject to liability for tortious interference with the contract between CGB and CGB's at-will therapists.

The jury was entitled to find, therefore, that Sunrise's actions were wrongful and tortious. Accordingly, the District Court properly refused to grant judgment notwithstanding the jury verdict on the claim against Sunrise for tortious interference with the contract between CGB and its therapists.

## C.

The jury awarded CGB punitive damages for Sunrise's interference. But while the verdict form makes it clear that the jury found that Sunrise tortiously interfered with both the contract between CGB and RHA/Pennsylvania and the contracts between CGB and its therapists, the form did not differentiate among these acts of interference for purposes of punitive damages. Thus, it is impossible to determine how punitive damages should be allocated in light of our determination that Sunrise could not have interfered with the contract between CGB and RHA/Pennsylvania. Consequently, we must reverse the punitive damage determination and remand to the District Court for a re-determination of punitive damages in accordance with this opinion. *See Rush v. Scott Specialty Cases, Inc.*, 113 F.3d 476, 485 (3d Cir. 1997); *Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699, 705 (3d Cir. 1988).

## IV.

On the second day of trial, the District Court denied Sunrise's request for a continuance. The basis for Sunrise's request was the sudden illness—and consequent unavailability—of one of Sunrise's key witnesses, Ms.

Tomes. Appellants contend that it was a prejudicial abuse of the District Court's discretion to deny that continuance.

In *Gaspar v. Kassm*, 493 F.2d 964 (3d Cir. 1974), we determined that the district court had abused its discretion in refusing to grant a continuance where the defendant was shown to be ill and unavailable. We stated:

> It is customary to grant a continuance on the ground of illness of a party. We conclude that Kassm's testimony was necessary for the defense of his case, that the granting of a continuance would not have unduly prejudiced the other parties, and that the continuance motion was not motivated by procrastination, bad planning or bad faith on the part of Kassm or his counsel. It is the law that where none of the foregoing appear, the denial of a continuance for illness is abuse of discretion.

*Id.* at 969. Appellants make much of the last sentence and suggest that we intended to establish a per se rule that—in the absence of evidence of procrastination, bad faith, or bad planning—a district court must grant a continuance lest it abuse its discretion. We hesitate to read our holding in *Gaspar* as a per se rule, in part, because the holding speaks in terms of discretion.[16]

In any case, the District Court did not abuse its discretion even under the broadest reading of *Gaspar*. The District Court observed that Sunrise "was required, as per [the District Court]'s Pretrial Trial Procedure as well as various orders, to have Ms. Tomes available in Court and ready to testify on the morning of June 10, 2002," but that, without explanation, Sunrise did not do so. *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 00-cv-04918, Order Dated November 6, 2002, at 8. The District Court questioned whether Sunrise "planned to prevent

---

16. Additional pause is warranted in light of more recent cases indicating that the appropriate test for a district court's refusal to grant a continuance is abuse of discretion, rather than any per se rule. *See EEOC v. State of Del. Dept. of Health and Social Servs.*, 865 F.2d 1408, n. 20 (3d Cir. 1989); *Concerned Citizens of Bushkill Tp. v. Costle*, 592 F.2d 164, 173 (3d Cir. 1979).

[CGB] from calling Ms. Tomes during its case in chief." *Id.*[17] The District Court then observed that, had Ms. Tomes been made available on June 10, as was required, her testimony would have concluded before she became too ill to testify. Faced with these facts, the District Court concluded that "[Sunrise]'s motion was clearly the product of bad planning and, most likely, bad faith." *Id.* at 7. The District Court was well situated to determine these fact- and credibility-laden questions and did not abuse its discretion.

## V.

Sunrise's motion for post-trial relief included an allegation that, on the eve of juror deliberations, Juror Number 2 circumvented the District Court's repeated admonitions and conducted independent factfinding related to the case. Specifically, Sunrise alleged that the juror used the Internet to conduct research into Sunrise's financial stability and that, during deliberations, he relied on the fruits of that research in determining a punitive damages amount. Although Sunrise's post-trial motion, dated June 24, 2002, marked the first time the District Court was made aware of such allegations, Sunrise asserted that Juror Number 2 personally admitted to his misconduct immediately after trial and in the presence of counsel for both CGB and Sunrise.

The District Court, mindful of the time lag between the verdict and the allegation, the problem of proving such allegations, and the circumspection appropriate in juror misconduct inquiries,[18] declined to subpoena the jury or declare a mistrial. Instead, the District Court assumed Sunrise's allegations to be true and concluded that the alleged misconduct did not taint the results of the verdict.

"In every case where the trial court learns that a member or members of the jury may have received extra-record information with a potential for substantial prejudice, the

---

17. Sunrise's briefs challenge the District Court's determination and ask why Sunrise would want to keep Ms. Tomes, a key witness in its case, from testifying. We decline to plumb the depths of these motivations.

18. *See Tanner v. United States*, 483 U.S. 107, 120 (1987).

trial court must determine whether the members of the jury have been prejudiced." *Gov't of the Virgin Islands v. Dowling*, 814 F.2d 134, 139 (3d Cir. 1987). In inquiring into allegations of juror misconduct, a district court must first establish whether or not extraneous information was introduced into jury deliberations, and then must make an objective assessment of how the information would affect the hypothetical average juror. *Wilson v. Vermont Castings, Inc.*, 170 F.3d 391, 394 (3d Cir. 1999). This Court reviews a district court's investigation of juror misconduct for an abuse of discretion. *Id.*

We, like the District Court, will assume that all of the alleged acts of misconduct actually occurred. Because the District Court declined to subpoena Juror Number 2, there is nothing in the record that illuminates the nature of the information impermissibly gathered, other than that it was "financial" in nature. But neither party disputes that this "financial information" could only have been relevant to the jury's determination of the amount of punitive damages. We have already determined that the jury's punitive damages determination must be reversed and the case remanded for a new trial on the question of punitive damages. We need not, therefore, determine whether the District Court erred in failing to grant a new trial because the reversal of the punitive damages determination moots the alleged juror misconduct.

## VI.

For the foregoing reasons, the judgment of the District Court entered on November 6, 2002 will be affirmed in part and reversed in part, and the case will be remanded for future proceedings in conformity with this opinion.

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*