

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-19-2000

# National Data Payment v. Meridian Bank

Precedential or Non-Precedential:

Docket 99-1445

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"National Data Payment v. Meridian Bank" (2000). *2000 Decisions.* Paper 102.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/102

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 19, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1445

NATIONAL DATA PAYMENT SYSTEMS, INC,
         Appellant

v.

MERIDIAN BANK;
CORESTATES FINANCIAL CORPORATION

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA
(Dist. Court No. 97-cv-06724)
District Court Judge: J. Curtis Joyner

Argued: March 6, 2000

Before: SCIRICA, ALITO, and ALDISERT, Circuit Judges

(Filed: May 19, 2000)

        ROBERT N. FELTOON (Argued)
        STEVEN PACHMAN
        Conrad O'Brien Gellman &
         Rohn, P.C.
        1515 Market Street, 16th Floor
        Philadelphia, PA 19102

        Counsel for Appellant

G. THOMPSON BELL, III (Argued)
MATTHEW W. RAPPLEYE
Stevens & Lee
111 North Sixth Street,
 P.O. Box 679
Reading, PA 19603

Counsel for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

Appellant National Data Payment Systems, Inc. ("NDPS") entered into a contract to purchase Meridian Bank's ("Meridian") merchant credit card business. The parties failed to close the deal prior to the contractual termination date. After the termination date had passed, Meridian exercised its option to call off the deal. NDPS brought suit against Meridian for breach of contract, alleging that it had failed to exercise its best efforts to bring the deal to a close. NDPS also sued CoreStates Financial Corp. ("CoreStates"), which had announced its planned acquisition of Meridian shortly before the events in dispute, for tortious interference with contractual relations. The District Court granted summary judgment in favor of the defendants, and we affirm.

I.

On September 15, 1995, NDPS entered into a Purchase Agreement (the "Agreement") with Meridian Bank for the purchase of Meridian's merchant credit card business. Three provisions of the Agreement are especially relevant to this case:

Closing/Best Efforts Clause -- Section 3.1 provided that a closing was to occur "on the date to be mutually agreed upon by the parties which shall be within thirty (30) days after the expiration or termination of any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976." (App. 378-79.) The section further provided

2

that "Meridian and NDPS agree to use their best efforts to achieve satisfaction of the conditions to Closing set forth in the Agreement and to consummate the Closing on the terms and subject to the conditions set forth in this Agreement." (App. 379.)

Termination Clause -- Section 11.1 provided that the "Agreement may be terminated by either Meridian or NDPS and shall be of no further force and effect . . . (b) in the event the Closing shall not have occurred by October 30, 1995." (App. 399.)

Written Waiver Clause -- Section 15.8 provided that "[t]his Agreement . . . shall not be amended, modified or waived in any fashion except by an instrument in writing signed by the parties hereto." (App. 404.)

The Agreement also contained a covenant that Meridian would not compete with NDPS in the merchant credit card business for ten years. (App. 388.) This covenant did not extend, however, to any company that subsequently acquired Meridian. (App. 389.)

On October 10, 1995--before the Agreement had closed--CoreStates announced that it had entered into a merger agreement under which it would acquire Meridian. CoreStates operated its own merchant credit card business and believed that Meridian's merchant portfolio--whose sale to NDPS was then pending--would be a valuable addition to its own business. CoreStates and Meridian thus decided to contact NDPS to see if it was still planning to go forward with the transaction.

On Thursday, October 26, 1995, Meridian arranged a conference call between representatives of NDPS, Meridian and CoreStates to discuss the effect that the CoreStates merger would have on the pending sale. Meridian Senior Vice President Michael Hughes opened the call by stating that "[w]e really have two options at this point in time. To proceed under the terms of the definitive agreement, or to mutually agree to terminate." (Hughes Dep., App. 160.) Meridian explained that the pending merger with CoreStates could change the economics of the NDPS-Meridian deal, because the Purchase Agreement's non-

competition covenant would not extend to CoreStates. (Hughes Dep., App. 160.)

CoreStates senior executive Thomas Kaplan then took the floor. In an exchange that various participants characterized as "heated" and "threatening," (Bucolo Dep., App. 67; Shea Dep., App. 215), Kaplan stated that CoreStates was building a network of "business banking centers" which would generate merchant credit leads. (Bucolo Dep., App. 67.) Kaplan claimed that CoreStates would not be required to share these leads with NDPS under the Agreement: "look, you know if you do this agreement, you're not going to get these referrals. . . . you guys just aren't going to get the value out of this deal." (Bucolo Dep., App. 67.) Meridian Vice President Chris Bucolo, who participated in the call, testified that he believed that "Mr. Kaplan's intent was to not allow the conversation to go anywhere other than, you know, if this deal goes through, you're not going to get the value."[1] At the end of the call, NDPS told Meridian that it would advise it of whether or not it wanted to proceed with the deal by the next Monday or Tuesday (that is, October 30 or 31).

The next day (Friday, October 27), Bucolo was told by Hughes that Meridian was "going to let the closing date [October 30] go by without responding to [NDPS] and basically try to rely on that part of the contract to not go through with the deal." (Bucolo Dep., App. 69-70.) As Bucolo understood it, "the game plan was to let the date essentially come and go and then rely on it to kill the deal." (Bucolo Dep., App. 69-70).

As of the following Monday--the October 30 termination date--Meridian had not heard back from NDPS. That day, Hughes called NDPS Senior Vice President Kevin Shea to inquire as to the status of the deal. Shea told Hughes that

---

1. Bucolo also testified that he believed that Kaplan's reference to CoreStates' "business banking centers" was "overstated" and "not consistent with the facts." He stated that the call was the first time he had ever heard of these centers, and that CoreStates subsequently informed him that there were "only a couple" in existence at that time. As a result, Bucolo opined that Kaplan's statements about the banking centers "seemed like a sham." (App. 68.)

4

NDPS was meeting on the topic that day, and that they would call Hughes back later that day or the next day. Hughes said that this would be "fine." (Shea Dep., App. 218.) Although Hughes recognized that October 30 was the "drop-dead date" under the Agreement, he consciously did not bring this fact to Shea's attention.[2] (Hughes Dep., App. 163.)

NDPS, in fact, did not get back to Meridian that day or the next. On November 2, Hughes had a telephone conversation with NDPS Vice President Eugene Horn, during which Hughes mentioned that the October 30 termination date had passed. (Horn Dep., App. 137.) Horn testified that he conveyed his own belief that NDPS wanted to close, and promised to get back to Hughes the next day. (Horn Dep., App. 137.)

On Friday, November 3, Horn again spoke with Hughes and advised him that NDPS was "prepared to close immediately." (Horn Dep., App. 141.) According to Horn, Hughes stated that Meridian was prepared to go forward with the closing and asked NDPS to set a date. (Horn Dep., App. 141.) Hughes disputes this account; on his telling, he never agreed on behalf of Meridian to close the deal. (Hughes Dep., App. 166-70.) Later that day, Horn faxed a letter to Hughes purporting to memorialize their conversation; the letter stated that its purpose was"to confirm our agreement to close the Purchase Agreement between Meridian Bank and National Data Payment Systems, Inc. on Tuesday, November 7, 1995 at 2:00 p.m. Georgia time at the offices of National Data Corporation in Atlanta." (App. 428-29.) Hughes was out of the office on November 3 and did not personally receive the letter until he returned to work on the following Monday, November 6.

On Monday, November 6, Meridian sent NDPS written

_____

2. While NDPS does not dispute that the Purchase Agreement explicitly contained an October 30 termination date, NDPS apparently did not focus on this provision until it was ultimately invoked by Meridian. According to one NDPS executive, NDPS's in-house legal counsel, when asked how long NDPS had to close the deal, mentioned only the 30-day window following Hart-Scott-Rodino clearance contained in S 3.1 without alluding to the termination provision. (Horn Dep., App. 126-27.)

notice that it was terminating the Agreement pursuant to
S 11.1. NDPS notified Meridian that it considered the
termination a breach of the Agreement, and filed suit in
federal court.

NDPS raised two primary arguments: first, that Meridian
had breached its obligation to use "best efforts" to
consummate the transaction during the period before the
termination date; and second, that Meridian impliedly
waived its right to rely on the termination provisions after
October 30, 1995. NDPS also brought a claim against
CoreStates for tortious interference with the Purchase
Agreement.

After discovery, both sides moved for summary judgment.
The District Court granted summary judgment in favor of
all defendants. See National Data Payment Sys., Inc. v.
Meridian Bank, 18 F. Supp. 2d 543 (1998). NDPS then
moved for reconsideration of the District Court's opinion
and order, claiming the court had failed to rule on its "best
efforts" claim. The District Court denied NDPS's motion,
stating that it had considered and rejected the"best efforts"
argument in its original opinion. NDPS appeals.

II.

On appeal, NDPS challenges three of the District Court's
rulings: (1) the grant of summary judgment in favor of
Meridian on NDPS's "best efforts" claim; (2) the grant of
summary judgment in favor of Meridian on NDPS's claim
that Meridian waived its right to terminate the Purchase
Agreement; and (3) the grant of summary judgment in favor
of CoreStates on NDPS's tortious interference claim.
Pennsylvania law governs all of these claims. We address
each in turn.

A.

NDPS first argues that Meridian breached the Purchase
Agreement by failing to use its best efforts to effectuate a
closing prior to the October 30 termination date. NDPS
acknowledges that, once the October 30 date had passed,
the termination option contained in S 11.1 superseded the

6

best efforts obligation of S 3.1. Consequently, NDPS does not argue that Meridian's November 6 termination, in itself, breached the contractual best efforts duty. Rather, NDPS claims that Meridian breached the contract by its conduct prior to the October 30 "drop-dead" date. We reject this claim.

NDPS points to several specific actions which it claims breached Meridian's good faith obligation. First, NDPS alleges in general terms that Meridian decided "to align itself with CoreStates' desire to retain Meridian's Merchant Business" rather than to sell it to NDPS. Appellant's Br. 42. According to NDPS, this alignment gave rise to Meridian's "game plan" to let the clock run on the Purchase Agreement until the October 30 termination date had passed. Second, NDPS points to Meridian's participation in the October 26 conference call, during which NDPS alleges that CoreStates misrepresented certain facts concerning its business banking centers and processing of referrals. NDPS alleges that Meridian was aware of these misrepresentations and had a duty to call them to NDPS's attention. Finally, NDPS relies on Meridian executive Michael Hughes's conscious failure to mention the termination date during his October 30 phone conversation with an NDPS official.

The duty of best efforts "has diligence as its essence" and is "more exacting" than the usual contractual duty of good faith. 2 E. Allan Farnsworth, Farnsworth on Contracts, 383–84 (2d ed. 1998). Notwithstanding this high standard, NDPS's allegations are insufficient as a matter of law to defeat the District Court's grant of summary judgment. Even if Meridian's actions constituted a default of its best-efforts obligation, NDPS has provided absolutely no evidence that, had Meridian's behavior been any different, a closing would have occurred by October 30. Indeed, the record clearly shows that the delay in closing was the result of NDPS's own evaluation procedures.

At the time of the October 26 conference call, NDPS had made no effort to schedule a closing before the October 30 termination date.3 Indeed, NDPS officials testified that they

_____

3. We note that the paperwork and other legal formalities which typically accompany a closing in a transaction of this magnitude are often

had not "focused" on that date; rather, their sole concern was to secure closing before the end of the 30-day period following Hart-Scott-Rodino approval. Moreover, after the October 26 call, NDPS made no efforts to contact Meridian about the status of the closing. When Meridian's Hughes contacted NDPS on October 30 to inquire eabout its plans, NDPS responded that it still had not decided whether to go through with the deal or not. Although NDPS claimed that it would have a definite answer by the next day at the latest, it did not make its final decision to close until November 3, well after the termination date. By this time, Meridian's good faith obligation had been superseded by the Agreement's express termination option, and it was free to call off the deal at its discretion.

Any "game plan" that Meridian might have had to delay closing until after October 30 cannot be relevant to this appeal, because NDPS has presented no evidence that it would have closed by that date under any circumstances. NDPS's claim that its closing was delayed because it needed to reassess its position in light of CoreStates's representations does not change this fact. Even on the eve of the NDPS-Meridian-CoreStates conference call--a mere four days before the October 30 termination date--NDPS had made no attempt to schedule a closing, and NDPS does not suggest on appeal that it would have done so had the conference call not occurred.

Moreover, we believe that Meridian had no duty under the Agreement's best-efforts provision to remind NDPS of the approaching termination date. The October 30 termination provision was the subject of substantial negotiations during the Agreement's drafting, and it was explicitly spelled out on the face of the Agreement. NDPS is a sophisticated business party who was represented by in-house and outside counsel throughout the events that are the subject of this lawsuit. NDPS was on notice of the termination date provision, and it cannot blame Meridian

_____

substantial and time-consuming. NDPS admits that it had not scheduled a closing date as of October 26--four days before the termination date--and does not suggest that it could have been prepared to close prior to October 30.

for its failure to "focus" on this unambiguous clause in the contract.

B.

NDPS next argues that Meridian's course of conduct constituted an implied waiver of the termination date provision. In particular, NDPS relies on the October 30 conversation between Hughes and Shea, in which Shea indicated that NDPS would have an answer on October 31 as to its plans to close. Hughes replied that this would be "fine," which NDPS reads as a waiver of the October 30 deadline.

We reject this argument. As the District Court noted, the Agreement's no-oral-waiver clause "clearly and unequivocally indicates the intention of the parties that there be no modifications or waivers of the contract provisions except in a writing signed by both parties. The parties even provided that delay in exercising rights under the contract would not constitute a waiver of those rights." National Data, 18 F. Supp. at 548.

NDPS attempts to avoid the no-oral-waiver clause by recharacterizing its argument as an estoppel theory. To succeed on an estoppel claim under Pennsylvania law, however, NDPS must show that it was "misled and prejudiced" by Meridian's conduct. See 2101 Allegheny Assocs. v. Cox Home Video, Inc., 1991 WL 225008, *9 (E.D. Pa. Oct. 29, 1991) (quoting Consolidated Rail Corp. v. Delaware & H.R. Co., 569 F. Supp. 25, 29-30 (E.D. Pa. 1983)). "As a general rule, mere silence or inaction is not a ground for estoppel unless there is a duty to speak or act." 2101 Allegheny, 1991 WL 225008 at *10 (quoting Farmers Trust Co. v. Bomberger, 523 A.2d 790, 794 (Pa. Super. 1987)).

In this case, NDPS could not have been prejudiced by Meridian's statement that a response by October 31 would be "fine." Even if NDPS had reasonably relied on this representation, the record shows that it did not, in fact, respond to Meridian on October 31. Rather, it waited until November 3 to propose a closing. At most, Hughes's statement would have estopped Meridian from exercising its

9

termination right on October 31; it could not have bound them until November 3.

Meridian's principal case, Cohen v. Weiss, 51 A.2d 740, 742-43 (Pa. 1947), is inapposite. Cohen dealt with a sale-of-property contract which contained a termination provision similar to the one at issue here. The buyer attempted to contact the seller on the termination date to arrange a closing three days after that date. The seller, however, did not respond to this request and instead delayed his decision until the next day so that he could exercise the termination option. Throughout, the seller used the pretext of his son's illness to induce the buyer into believing that his mind was not on the transaction. The Pennsylvania Supreme Court found that the seller was estopped from terminating because his delay and deceit functioned" `as a trap' to put the purchaser `off his guard.' " Id. at 743.

In the present case, in contrast, NDPS never made a concrete request to close prior to the termination date; nor was there any affirmative misrepresentation by Meridian. The facts before us are more analogous to New Eastwick Corp. v. Philadelphia Builders Eastwick Corp., 241 A.2d 766 (Pa. 1968), where the Pennsylvania Supreme Court held that a party who merely remained silent and allowed a termination date to pass without comment was not estopped from exercising its termination option. Here, as in New Eastwick, Meridian's mere inaction "can in no way be said to give [the appellant] permission to ignore the then existing terms of that contract." Id. at 769.

C.

Finally, NDPS appeals the District Court's grant of summary judgment in favor of CoreStates on the tortious interference with contract relations claim. The District Court found that CoreStates was privileged to influence Meridian's contract because it was a prospective purchaser of Meridian with a substantial financial interest in the deal.

Under Pennsylvania law, "[t]he tort of inducing breach of contract . . . is defined as inducing or otherwise causing a third person not to perform a contract with another . . . without a privilege to do so." Glazer v. Chandler, 200 A.2d

10

416, 418 (Pa. 1964). A number of federal courts, construing Pennsylvania law, have held that a corporate parent or prospective corporate parent is privileged to interfere with the contractual relations of its subsidiary. In Green v. Interstate United Management Services Corp., 748 F.2d 827 (3d Cir. 1984), a parent corporation instructed its wholly-owned subsidiary not to sign a lease after an appraiser opined that the contract was a bad bargain. This Court found that the interference was privileged due to the parent's interest in preventing the dissipation of its subsidiary's assets. Similarly, in Advent Systems Limited v. Unisys Corp., 925 F.2d 670, 673 (3d Cir. 1991), we noted that a prospective purchaser's "interest in thefinancial stability of its subsidiary and the need to avoid a situation where the two would be working at cross-purposes justified the disruption" of pending contract negotiations with a third party. In Mercier v. ICH Corp., 1990 WL 107325 (E.D. Pa. July 25, 1990), relied on by the court below, the District Court extended this reasoning to interference by a prospective corporate purchaser. In Mercier, the defendant ICH planned to buy Tenneco's Philadelphia Life subsidiary. Prior to the purchase, Tenneco and plaintiff Mercier agreed to various severance conditions relating to Mercier's employment at Philadelphia Life. On ICH's urging, however, Tenneco decided not to follow through with the agreed-upon severance package and Mercier sued for tortious interference. The District Court granted summary judgment in favor of ICH, noting that "[b]ecause ICH had expressed its intention to acquire Philadelphia Life from Tenneco, it was privileged to influence the severance contract Tenneco offered to Mercier, relating to his continued employment or termination by Philadelphia Life." Id. at *15.

These cases support the District Court's conclusion that CoreStates, as a prospective purchaser of Meridian, was privileged to influence Meridian's contract obligations. This conclusion is bolstered by the fact that CoreStates expressed its intention to remain in the merchant credit processing business--an undertaking that would place it "at cross-purposes" with Meridian's sale of its own merchant business assets. See Advent Sys., 925 F.2d at 673.

11

We note, however, that a recent decision by the Pennsylvania Superior Court has embraced a narrower version of the corporate parent privilege than was explicated in the above-cited cases. See Shared Comm. Servs. of 1800-80 JFK Boulevard, Inc. v. Bell Atlantic Properties, Inc., 692 A.2d 570 (Pa. Super. 1997). The Shared Communications court distinguished Advent Systems and Green, noting that in those cases, the parent's privilege to interfere was based upon its interest in preventing the waste of the subsidiary's corporate assets. See id. at 575. The court found it significant that

> In neither of those cases did the corporate parent instruct the subsidiary to abrogate contractual relations with a third party in order to commence those same relations with another subsidiary of the same corporate parent. In neither of those cases did the corporate parent instruct the subsidiary to ignore its contractual relations with a third party and surreptitiously provide services to a corporate"sibling" which the subsidiary was contractually bound to deliver to a third party.

Id. It went on to conclude that when the interference is "not to prevent asset dissipation, but rather, to help[the parent] to aggrandize," there is no privilege. Id.

As Shared Communications indicates, the exact scope of the corporate parent privilege is unclear, and the Pennsylvania Supreme Court has not yet spoken on this issue. We need not resolve this difficult question, however, because CoreStates offers a second basis for its privilege, which we find independently dispositive.

Under the Restatement (Second) of TortsS 768,

> One who intentionally causes a third person . . . not to continue an existing contract terminable at will does not interfere improperly with the other's relation if:
>
> (a) the relation concerns a matter involved in the competition between the actor and another and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and

12

> (d) his purpose is at least in part to advance his interest in competing with the other.

See Gilbert v. Otterson, 550 A.2d 550, 554 (Pa. Super. 1988) (recognizing Pennsylvania's adoption of S 768). Because the Purchase Agreement was terminable at will (by virtue of the October 30 termination date) when Meridian opted to pull out, S 768 applies to this case.

CoreStates clearly was a competitor with NDPS in the merchant credit card business; it acted to advance its own business; and there is no allegation that its interference created any unlawful restraint of trade. The determinative question, then, is whether CoreStates "employ[ed] wrongful means." Although the Pennsylvania Supreme Court has not yet supplied a definition of wrongful means, this Court recently noted that a number of jurisdictions have interpreted the section "to require independently actionable conduct on the part of the defendant." Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 130 F.3d 494, 531 (3d Cir. 1998) (citing DP-Tek, Inc. v. AT&T Global Information Solutions Co., 100 F.3d 828, 833-35 (10th Cir. 1996)). See also Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1507 (8th Cir. 1992) ("wrongful means" is "conduct which is itself capable of forming the basis for liability of the actor"); Briner Elec. Co. v. Sachs Elec. Co., 680 S.W.2d 737, 741 (Mo. App. 1984) (same).

This "independently actionable" approach is borne out by the commentary to S 768. Comment (e) states that "wrongful means" includes "predatory means . . . physical violence, fraud, civil suits[,] criminal prosecutions, [and] exerting a superior power in affairs unrelated to their competition." Restatment (Second) of Torts  S 768, cmt. e. Each of these enumerated activities would itself be independently actionable under the laws of torts or unfair competition. Based on these factors, we believe that Pennsylvania would follow the "independently actionable" approach for S 768 claims.

Because the conduct of which NDPS complains was not independently actionable, CoreStates is protected by the competitor's privilege. Taking all facts in the light most favorable to NDPS, we conclude that CoreStates, at most,

overstated its future ability to compete with NDPS through its network of business banking centers. NDPS relies primarily on the following statements by CoreStates' Kaplan during the October 26 conference call, as recounted by Meridian Vice President Chris Bucolo:

> [H]e said things like, we're building a network of business banking centers that aren't branches, and that's where all of our leads are going to get generated. So even if it says we're going to get branch referrals in the agreement, most of our leads aren't even going to go through the branches. They're going to come through these business banking centers that we're building. He said, look, you guys just aren't going to get the value out of the deal.

(Bucolo Dep., App. 67.) Bucolo further testified that after the call, CoreStates admitted to him that they had "only a couple" business banking centers in place. (Bucolo Dep., App. 68.)

These allegations are insufficient as a matter law to establish independently actionable fraud. A statement as to future plans or intentions is not fraudulent under Pennsylvania law unless it knowingly misstates the speaker's true state of mind when made. See College Watercolor Group, Inc. v. William H. Newbauer, Inc. , 360 A.2d 200, 206 (Pa. 1976). Here, NDPS has presented no evidence to indicate that CoreStates did not, in fact, plan to build an extensive network of banking centers, even if they were not in existence at the time of the October 26 conference call. Because CoreStates' representations did not constitute independently actionable fraud, and because CoreStates has satisfied all of the other requirements of Restatement S 768, it was privileged and therefore protected for liability for tortious interference with contractual relations.

III.

For the foregoing reasons, the judgment of the District Court is affirmed.

14

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

15