[Cite as *Cintrifuse Landlord, L.L.C. v. Panino, L.L.C.*, 2022-Ohio-4104.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| CINTRIFUSE LANDLORD, LLC, | : | APPEAL NOS. C-220050 |
|  |  | C-220065 |
| Plaintiff-Appellee/ | : | TRIAL NO.  A-2000757 |
| Cross-Appellant, |  |  |
|  | : |  |
| vs. |  |  |
|  | : | *O P I N I O N.* |
| PANINO, LLC, |  |  |
|  | : |  |
| and |  |  |
|  | : |  |
| NINO LORETO, |  |  |
|  | : |  |
| Defendants-Appellants/ |  |  |
| Cross-Appellees/ | : |  |
| Third-Party Plaintiffs, |  |  |
|  | : |  |
| and |  |  |
|  | : |  |
| REMO A. LORETO, |  |  |
|  | : |  |
| and |  |  |
|  | : |  |
| PATRICIA A. LORETO, |  |  |
|  | : |  |
| Defendants, |  |  |
|  | : |  |
| vs. |  |  |
|  | : |  |
| CINCINNATI CENTER CITY |  |  |
| DEVELOPMENT CORPORATION, | : |  |
|  |  |  |
| Third-Party Defendant-Appellee. | : |  |

Civil Appeals From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Reversed and Cause Remanded in C-220050; Appeal
Dismissed in C-220065

Date of Judgment Entry on Appeal: November 18, 2022

*Taft Stettinius & Hollister LLP*, *Nicholas J. Pieczonka* and *Anna M. Greve,* for Plaintiff-Appellee/Cross-Appellant and Third-Party Defendant-Appellee,

*Croskery Law Offices* and *Robert F. Croskery,* for Defendants-Appellants/Cross-Appellees/Third-Party Plaintiffs.

**CROUSE, Judge.**

**{¶1}** Defendants-appellants Panino, LLC, ("Panino") and Nino Loreto appeal the trial court's decision to grant summary judgment to plaintiff-appellee Cintrifuse Landlord, LLC, ("Cintrifuse") and third-party defendant-appellee Cincinnati Center City Development Corporation ("3CDC"). Cintrifuse sued Panino and Loreto (collectively, "Appellants") for breach of contract, replevin, and conversion after Appellants failed to pay rent on Panino's restaurant space and removed personal property from the restaurant in which Cintrifuse claimed a security interest. Appellants countersued for breach of contract and fraud-related claims. For the reasons discussed below, we reverse the trial court's grant of summary judgment and remand for further proceedings.

**Factual and Procedural History**

**{¶2}** In April 2016, Panino, a restaurant owned and operated by Loreto, entered into a commercial lease agreement with Cintrifuse, a subsidiary of 3CDC.[1] The lease was for restaurant space located at 1313-1315 Vine Street in the Over-the-Rhine neighborhood of Cincinnati, Ohio.

**{¶3}** The parties discussed the construction of an outdoor dining/bar patio in the pocket park[2] called "Imagination Alley" next to Panino. However, patio space in

---

[1] Cintrifuse is a subsidiary of 3CDC, is represented by the same attorneys as 3CDC, and often acts through agents who are also 3CDC employees. For example, the Panino-Cintrifuse lease was signed for Cintrifuse by Adam Gelter, who is 3CDC's Executive Vice President. While we have attempted throughout this opinion to attribute acts of Cintrifuse and 3CDC to the correct entity, the record is not always clear as to which entity undertook certain acts. Where the record is unclear, we refer to Cintrifuse because it is the landlord and Panino's counterparty to the lease agreement, as well as the plaintiff in this action.

[2] A pocket park is a small, outdoor space, typically located in an urban area without many other opportunities for outdoor recreation. National Recreation and Park Association, *Creating Mini-Parks for Increased Physical Activity,* https://www.nrpa.org/contentassets/f768428a39aa4035ae55b2aaff372617/pocket-parks.pdf (accessed Nov. 1, 2022). Such parks may offer event spaces, playgrounds, or other means for the general public to enjoy the outdoors. *Id.*

the pocket park was not a part of the lease agreement because the park was not owned by Cintrifuse or 3CDC. The adjacent portion of Imagination Alley was and is owned by the city of Cincinnati, and the park was managed by the Cincinnati Recreation Commission ("CRC") at all relevant times.

{¶4} The lease agreement included the following provision regarding attempts to acquire the park:

3.8. Landlord and Tenant both desire that an outdoor service area/bar area shall be created and included within this Lease. Tenant and Landlord both recognize that Landlord does not currently own the land upon which an outdoor service area/bar can be created. Landlord and Tenant will mutually agree upon the size to the outdoor service area/bar area. *Landlord shall provide its best efforts in obtaining the approval of the any [sic] governmental and community entities to purchase the land* and manage the installation of the outdoor bar and additional service area contemplated by the Landlord and Tenant. Additional service area/ bar [sic] area will be constructed at the sole cost of the Tenant.

(Emphasis added.) The parties refer to the emphasized provision as the "best-efforts" provision.

{¶5} Panino opened in November 2016 and operated for three years, but struggled financially. It ultimately accrued $175,000 in overdue rent. In November 2019, Cintrifuse sent Appellants a notice to leave the premises. In the notice, Cintrifuse instructed Loreto to leave the liquor license and various fixtures and pieces of restaurant equipment behind because, per the lease, Cintrifuse had a security interest in those items. In December, Cintrifuse sent Appellants two additional letters

reminding Loreto to leave the collateral in the building. When Loreto vacated the building on December 15, 2019, he took the liquor license and some of the restaurant equipment with him.

{¶6} In February 2020, Cintrifuse sued Appellants for breach of contract, replevin, and conversion. Cintrifuse later amended its complaint to add as defendants Loreto's parents, Remo and Patricia Loreto, who had helped finance the restaurant. Appellants brought counterclaims for breach of contract, bad-faith breach of contract, and abuse of process. Appellants also asserted third-party claims against 3CDC for fraudulent inducement, fraud by omission and misrepresentation, and conspiracy to commit abuse of process.

{¶7} In July 2020, the court held a multiday replevin hearing to determine whether Cintrifuse was entitled to take immediate possession of the collateral it claimed under the lease pending a final judgment in this action. To be entitled to immediate possession, Cintrifuse was required to demonstrate probable cause of its right to permanent possession of the collateral. *See* R.C. 2737.03 and 2737.07(B). The court ruled that Cintrifuse had failed to carry its burden because it had failed to prove "best efforts to obtain ownership or control of the patio area."

{¶8} In September 2021, Cintrifuse and 3CDC moved for summary judgment. The trial court granted the motion, and, after a hearing on the matter, awarded Cintrifuse $197,161.41 in damages. This appeal timely followed.

{¶9} Appellants argue in three assignments of error that the trial court erred in granting summary judgment in favor of Cintrifuse and 3CDC because (1) Cintrifuse and 3CDC failed to satisfy their best-efforts obligation under the lease agreement; (2) Cintrifuse and 3CDC fraudulently induced Loreto into signing the lease agreement;

and (3) Cintrifuse and 3CDC committed fraud by telling Loreto that they were "planning to move forward with the patio construction" in June 2016.

{¶10} Cintrifuse has filed a cross-appeal, arguing that the trial court erred in failing to award it additional damages for build-out and liquor-license expenses and attorney fees.

{¶11} For the reasons discussed below, we sustain Appellants' first assignment of error and overrule their second and third assignments of error. Our disposition of the first assignment of error makes the cross-assignment of error moot. We reverse the trial court's judgment and remand the cause to the trial court.

**The Notice of Appeal**

{¶12} Cintrifuse and 3CDC argue that Appellants failed to appeal the grant of summary judgment in favor of 3CDC, and, therefore, this court should not entertain their arguments as they relate to 3CDC.

{¶13} App.R. 3(D) governs the contents of the notice of appeal. It states, "The notice of appeal shall specify the party or parties taking the appeal; shall designate the judgment, order or *part thereof appealed from*; and shall name the court to which the appeal is taken." (Emphasis added.)

{¶14} Where the notice of appeal is "technically incorrect," but fulfills its "basic purpose of informing the parties and the court, in a timely manner, of appellant's intention of appealing a specified judgment," the notice of appeal is sufficient. *Natl. Mut. Ins. Co. v. Papenhagen,* 30 Ohio St.3d 14, 16, 505 N.E.2d 980 (1987). "[J]ustice is ultimately best served by an attitude of judicial tolerance toward minor errors, made in good faith, which pose no danger of prejudice to the opposing party or to the court's essential functions." *Id.*

{¶15} Cintrifuse is the plaintiff and 3CDC is a third-party defendant. Cintrifuse and 3CDC jointly moved for summary judgment. The trial court granted summary judgment as to both in an entry entitled "Order Granting Motion of Cintrifuse Landlord, LLC and Cincinnati Center City Development Corporation for Summary Judgment." Appellants' notice of appeal is entitled "Defendants' Notice of Appeal of the Order Granting *Defendant's* [sic] Motion for Summary Judgment and on the Final Order Awarding Damages." (Emphasis added.) In the notice, Appellants stated that they were appealing the "Attached Order and Entry Granting Plaintiff's Motion for Summary Judgment" and the "attached Final Order dated January 25, 2022, awarding Damages to Plaintiff." Attached to the notice of appeal are the trial court's order granting summary judgment and final order on damages. Appellants' appeal can be read as appealing the judgment as to both the third-party defendant and the plaintiff. And, despite the flaws, the notice of appeal informed the parties of Appellants' intention to appeal the trial court's order granting summary judgment in favor of both Cintrifuse and 3CDC. Cintrifuse is a subsidiary of 3CDC and both parties were represented by the same lawyers. Both parties were served with the notice of appeal. This court will entertain Appellants' arguments as they relate to 3CDC.

**Cintrifuse's Waiver Arguments**

{¶16} Cintrifuse alleged claims for breach of contract, replevin, and conversion. It claimed that Panino's failure to pay rent resulted in a breach of the lease agreement. It claimed conversion and replevin because Loreto took the liquor license and some of the restaurant equipment with him when he vacated the premises in December 2020.

{¶17} Cintrifuse argues that Appellants' failure to discuss the replevin and

conversion claims in their merit brief has resulted in a waiver of any argument on those claims. Appellants contend that they did not discuss the conversion and replevin claims because those claims are contingent on the breach-of-contract claim. Appellants argue that Cintrifuse would have no right to the collateral if not for Panino's failure to pay rent, and that Panino would not have failed to pay rent if not for Cintrifuse's failure to satisfy its best-efforts obligation. Because there are genuine issues of material fact as to whether Cintrifuse satisfied its best-efforts obligation, we cannot say at this point whether Cintrifuse has a right to possession of the collateral. Therefore, Appellants have not waived their arguments regarding Cintrifuse's conversion and replevin claims.

{¶18} Cintrifuse also argues that Appellants waived their abuse-of-process claim by not discussing it in their appellate brief. Appellants argue that they did not discuss the abuse-of-process claim because the court rendered a judgment on the merits in Cintrifuse's favor.

{¶19} Abuse of process consists of the attempt to "achieve through the use of the court that which the court is itself powerless to order." *Gemperline v. Franano,* 5th Dist. Delaware No. 21 CAE 01 0002, 2021-Ohio-2394, ¶ 19, quoting *Robb v. Chagrin Lagoons Yacht Club,* 75 Ohio St.3d 264, 271, 662 N.E.2d 9 (1996). In an abuse-of-process case, "the improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Id.*

{¶20} Because the court granted Cintrifuse and 3CDC's motion for summary judgment, there simply was nothing for Appellants to discuss on appeal regarding

their abuse-of-process claim. Appellants have not waived their claim for abuse of process.

## Summary Judgment

**{¶21}** This court reviews a trial court's decision on summary judgment de novo. *Amankwah v. Liberty Mut. Ins. Co.*, 2016-Ohio-1321, 62 N.E.3d 814, ¶ 9 (1st Dist.). Summary judgment is proper under Civ.R. 56(C) when no genuine issues as to any material fact remain; the moving party is entitled to judgment as a matter of law; and it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Id.*

## Appellants' First Assignment of Error

**{¶22}** In their first assignment of error, Appellants argue that the trial court erred in holding that there was no genuine issue of material fact regarding whether Cintrifuse had used its "best efforts" to obtain the approval of governmental and community entities for the acquisition of the patio. Appellants contend that multiple facts demonstrate that Cintrifuse breached the lease agreement when it failed to satisfy its best-efforts obligation. To prevail on a breach-of-contract claim, a party must prove the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *White v. Pitman*, 2020-Ohio-3957, 156 N.E.3d 1026, ¶ 37 (1st Dist.).

### I. Best Efforts Defined

**{¶23}** The phrase "best efforts" is not defined in the lease agreement. Therefore, it is up to the court to define the phrase while considering the circumstances

surrounding the agreement. *See Perma Research & Dev. Co. v. Singer Co.*, 308 F.Supp. 743, 748 (S.D.N.Y.1970) (" 'Best efforts' * * * is a term which necessarily takes its meaning from the circumstances."); *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 233 (3d Cir.2001) (" 'Best efforts' has been widely held to be an ambiguous contract term * * * [and] depends on the factual circumstances surrounding an agreement.").

**{¶24}** Definitions of "best efforts" vary among jurisdictions. A minority of courts have held that "best efforts" is equivalent to the duty of good faith. *See* Thau, *Is This Really the Best We Can Do? American Courts' Irrational Efforts Clause Jurisprudence and How We Can Start to Fix It*, 109 Geo.L.J. 665, 673 (2021); *Macksey v. Egan*, 36 Mass.App.Ct. 463, 471, 633 N.E.2d 408 (1994), fn. 16; *Triple-A Baseball Club Assocs. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 225 (1st Cir.1987).

**{¶25}** However, a duty of good faith is implied in every contract. Therefore, equating best efforts with good faith would make best-efforts clauses meaningless.

**{¶26}** Other courts have distinguished best efforts from good faith by holding that diligence is central to best efforts, while fairness and honesty are central to good faith. *See Natl. Data Payment Sys. v. Meridian Bank*, 212 F.3d 849, 854 (3d Cir.2000) ("The duty of best efforts 'has diligence as its essence' and is 'more exacting' than the usual contractual duty of good faith."); *Triad Packaging, Inc. v. SupplyOne, Inc.*, 597 F.Appx. 734, 742 (4th Cir.2015) ("best efforts generally means 'diligent attempts to carry out an obligation.' "); Farnsworth, *On Trying to Keep One's Promises: The Duty of Best Efforts in Contract Law*, 46 U.Pitt.L.Rev. 1, 8 (1984) ("Good faith is a standard that has honesty and fairness at its core and that is imposed on every party to a contract. Best efforts is a standard that has diligence as its essence and is imposed only

on those contracting parties that have undertaken such performance.").

{¶27} Other courts focus on the reasonableness of the efforts. *See, e.g., Doyle v. Jewell*, D.Utah No. 2:13-cv-861-CW, 2015 U.S. Dist. LEXIS 47766, *18 (Apr. 9, 2015) ("The very purpose of a best-efforts clause is to commit a party to undertake all reasonable actions in light of circumstances beyond its control."). In fact, some courts equate "reasonable efforts" with "best efforts." *See, e.g., Permanence Corp. v. Kennametal, Inc.*, 908 F.2d 98, 100 (6th Cir.1990), fn. 2 ("A more accurate description of the obligation owed would be the exercise of 'due diligence' or 'reasonable efforts.' "). A minority of courts have rejected this notion entirely and have held that a duty of best efforts requires *more* than reasonable efforts. Thau, 109 Geo.L.J. at 683.

{¶28} There is little case law in Ohio on the matter. The Eighth District, in interpreting a best-efforts obligation in a dissolution decree, utilized the *Black's Law Dictionary* definition of "best efforts." *Bridgeland v. Bridgeland*, 8th Dist. Cuyahoga No. 109831, 2021-Ohio-2587, ¶ 23. The court defined best efforts as:

> Diligent attempts to carry out an obligation; esp., all actions rationally calculated to achieve a stated objective, to the point of leaving no possible route to success untried. As a standard, a best-efforts obligation is stronger than a good-faith obligation. Best efforts are measured by the measures that a reasonable person in the same circumstances and of the same nature as the acting party would take.

*Id.*, quoting *Black's Law Dictionary* 196 (11th Ed.2019). The court also stated that "best efforts" are "marked by flexibility and reasonable breadth, rather than meticulous specificity." *Id.*

{¶29} Despite the disaccord among courts, there seems to be widespread

11

agreement that "best efforts" does not mean "every conceivable effort," nor does it guarantee a certain result. *See, e.g., Coady Corp. v. Toyota Motor Distribs.*, 361 F.3d 50, 59 (1st Cir.2004) (" 'Best efforts' is implicitly qualified by a reasonableness test–it cannot mean everything possible under the sun."); *Mark Technologies Corp. v. Utah Resources Internatl., Inc.*, 2006 UT App 418, 147 P.3d 509, ¶ 8 ("Neither success nor the single-minded pursuit of the objective is required."); *Doyle* at *18 ("A best-efforts clause does not assure that the goal will be accomplished."). Thus, we reject the Eighth District's inclusion of "all actions rationally calculated to achieve a stated objective, to the point of leaving no possible route to success untried" in a practical definition of "best efforts." *Bridgeland* at ¶ 23.

{¶30} Courts also commonly consider the responsible party's sophistication and skills, as well as the standards of the relevant industry when determining whether the party has made its best efforts. *See Bloor v. Falstaff Brewing Corp.*, 454 F.Supp. 258, 267 (S.D.N.Y.1978) (the promisor's actions should be judged in accordance with the "average, prudent, comparable" party); *First Union Natl. Bank v. Steele Software Sys. Corp.*, 154 Md.App. 97, 173, 838 A.2d 404 (2003) (in making its best-efforts determination, the jury was entitled to consider "the standard in the industry regarding similar contracts between banks and their settlement service vendors"); Farnsworth, 46 U.Pitt.L.Rev. at 9 ("[I]f the promisor is a person, such as an architect or lawyer, whose occupation is to make special skills available to those who do not possess those skills, courts commonly ask what efforts a person possessing those skills would use if that person were in the promisor's place.").

{¶31} As the facts of the present case demonstrate, commercial real estate cases often involve multiple parties and multiple factors that are outside of the

contracting parties' control. Contractual obligations may take years to fulfill, with the circumstances surrounding the obligations constantly changing. Adopting an overly onerous definition of best efforts would contradict this reality. Therefore, we choose to focus on the diligence of the responsible party and the reasonableness of its actions in light of the attendant circumstances.

{¶32} We therefore synthesize "best efforts" as follows: The duty of "best efforts" is more exacting than the duty of good faith. *Natl. Data Payment Sys., Inc.*, 212 F.3d at 854. It requires the promisor to pursue its contractual obligations diligently and with reasonable effort considering its ability, the means at its disposal, and the other party's justifiable expectations. *Triad Packaging, Inc.*, 597 F.Appx. at 742; *T.S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 720, 924 P.2d 1239 (1996). The duty of best efforts requires that the responsible party pursue all reasonable methods of satisfying its obligations in light of circumstances beyond its control. *Kroboth v. Brent*, 215 A.D.2d 813, 814, 625 N.Y.S.2d 748 (1995); *Doyle*, D.Utah No. 2:13-cv-861-CW, 2015 U.S. Dist. LEXIS 47766, at *18; *United Telecommunications, Inc. v. Am. Television & Communications Corp.*, 536 F.2d 1310, 1319 (10th Cir.1976), fn. 8. "Best efforts" does not mean leaving no stone unturned or making every conceivable effort.

## II. Best Efforts and Summary Judgment

{¶33} Because best-efforts determinations are typically fact-intensive inquiries, courts often hold that the issue is inappropriate for summary judgment. *See First Union Natl. Bank*, 154 Md.App. at 139, 838 A.2d 404 ("although contract interpretation is generally a question of law, a factual determination may be required as to what is deemed to be 'best efforts.' "); *Cook v. Wal-Mart, Inc.*, 8th Dist. Cuyahoga

No. 79451, 2002 Ohio App. LEXIS 937, *9 (Mar. 7, 2002) ("The best efforts required by the contract is a highly individual standard. Whether appellant complied with it is an issue of fact."); *Toth Auto Lease, Inc. v. Palladina*, 8th Dist. Cuyahoga No. 44965, 1983 Ohio App. LEXIS 15287, *3 (Jan. 27, 1983) (holding that because the parties testified to different understandings of the term "best efforts," and the contract did not define that term or outline objective methods to determine "best efforts," the meaning of the phrase was a question of fact); *Clarke v. Hartley*, 7 Ohio App.3d 147, 151, 454 N.E.2d 1322 (8th Dist.1982) (holding that whether the buyer made a best effort at obtaining financing by applying for a loan at only one lending institution was a question of fact for the jury); *see also Weaver v. Romaniuk*, 1st Dist. Hamilton No. C-890642, 1990 Ohio App. LEXIS 4931, *4 (Nov. 14, 1990) (holding that whether the responsible party had made a "diligent effort" to obtain financing by submitting one loan application was an issue for the trier of fact).

{¶34} "The law interpreting the best efforts standard focuses on the factual nuances of the parties' dispute." *Marquardt Co. v. United States*, 101 Fed.Cl. 265, 273 (2011). "The best efforts standard 'cannot be defined in terms of a fixed formula; it varies with the facts and the field of law involved.' " *Id.*, quoting *Pinpoint Consumer Targeting Servs., Inc. v. United States*, 59 Fed.Cl. 74, 82 (2003), quoting *Triple-A Baseball Club Assocs. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 225 (1st Cir.1987). "Whatever the variation in the exact terms used to express the legal standard for best efforts, courts largely agree that in many cases 'disputes as to the application of "best efforts" clauses present factual issues that preclude summary judgment.' " *Id.* at 237-274, quoting *Northrop Grumman Computing Sys., Inc. v. United States*, 93 Fed.Cl. 144, 151 (2010), fn. 7.

{¶35} In *Marquardt,* the court denied the government's motion for summary judgment because "neither party's interpretation of the clause can be sustained by looking only to the plain text of the Agreement." *Id.* at 272. "[R]esolution of the parties' dispute here requires resolution of disputed factual questions and, in particular, 'requires knowledge not only of what [the defendant] did, but could have done, to obtain this funding.' " *Id.* at 274, quoting *Northrop* at 150.

{¶36} Cintrifuse argues that summary judgment can be appropriate in cases involving best-efforts provisions and cites several cases from outside Ohio in support. *See, e.g., Kalenburg v. Klein*, 847 N.W.2d 34, 39 (Minn.App.2014) (affirming summary judgment in favor of residential homebuyer where the buyer had used best efforts to attempt to obtain financing after being denied financing by two separate lenders based on a low appraisal value of the property); *Stand Up Digital, Inc. v. Hart*, 838 Fed.Appx. 733, 735-736 (4th Cir.2020) (affirming summary judgment in favor of defendant-comedian where comedian obligated to use best efforts to promote a video game failed to appear at an in-store promotion, but participated in other promotional opportunities, such as social media posts, and made the game over $1 million); *Agrico Canada Ltd. v. Helm Fertilizer Corp.*, 385 Fed.Appx. 898, 899-900 (11th Cir.2010) (affirming summary judgment in favor of shipper of bulk fertilizer where the shipper was required to use "best efforts" to deliver fertilizer within a 15-day window and made delivery six hours after the window had expired). However, we note that these cases are either factually much simpler than the present case (*Kalenburg*, *Agrico*) or the courts did not analyze the best-efforts issue with much depth (*Hart*, *Agrico*).

{¶37} There may be rare cases in which summary judgment is appropriate to resolve the question of whether a contracting party has met its best-efforts obligation.

However, because there remain genuine issues of material fact discussed below, this is not such a case.

### III.    Efforts to acquire Imagination Alley

**{¶38}**  Cintrifuse and 3CDC primarily interacted with two entities to acquire Imagination Alley: CRC and the Over-the-Rhine Community Council ("OTRCC").

**{¶39}**  In September 2015, Loreto signed a letter of intent to lease the space at 1313-1315 Vine Street. At that time, Cintrifuse had a temporary lease with CRC to use Imagination Alley as a place to store construction equipment for construction work being done on the building at 1313-1315 Vine Street. On October 12, 2015, Adam Gelter of 3CDC attended a meeting of the OTRCC Board of Trustees and discussed the park. According to the meeting minutes, 3CDC proposed that Cintrifuse be granted a long-term, expanded lease to Imagination Alley "to maintain the art, the public use and manage the park." On October 15, 2015, Gelter sent an email to Markiea Carter of the city of Cincinnati. He informed Carter that 3CDC had "both CRC and OTR Community Council Board support for a long term lease for Imagination Alley," pursuant to three conditions. One of the conditions was that "a portion of the alley" would remain open to the public. Stephen Pacella of CRC, in an email to Carter dated October 20, 2015, confirmed CRC support, "based on community council approval and that as much of the art as possible could be utilized/incorporated into any new design."

**{¶40}**  Gelter attended an OTRCC member's meeting on October 26, 2015. According to the meeting minutes, Gelter expressed that Cintrifuse was interested in a long-term master lease of the park. Cintrifuse would maintain the art and murals, "create a space near the sidewalk for public," and would reserve "the back half of the space for their own use," although Gelter did not clarify how Cintrifuse would use the

back half of the space. Imagination Alley was further discussed at the November 23, 2015 and January 25, 2016 meetings, where 3CDC presented OTRCC with an image of Imagination Alley that showed that a pedestrian walkway through the park would be preserved.

{¶41}  Gelter testified at the July 28, 2020 replevin hearing that in early 2016, Cintrifuse had the support of the city manager and CRC director for its plan to either purchase or long-term lease Imagination Alley. But in May 2016, the director of CRC changed, and Daniel Betts came into the position. Gelter testified that Betts was more sensitive to the community's views and eventually made it a condition of the sale or lease of the park that the parties get the approval of OTRCC. Gelter testified that as a result, the strategy employed by Cintrifuse changed. The new strategy was to convince OTRCC that Cintrifuse would make improvements to Imagination Alley as a whole. If OTRCC approved of the idea, Betts would then present the plan to the CRC board of commissioners for final approval.

{¶42}  As representative for Panino under Civ.R. 30(B)(5), Loreto testified in his deposition that before signing the lease on April 29, 2016, he had been assured many times by multiple people at 3CDC that he would have the patio. On May 3, 2016, the Business Courier published an article in which Loreto mentioned that his new restaurant would have a patio. Susan Tolentino of 3CDC called Loreto and told him that he should not have discussed the patio with the Business Courier reporter because the land had not yet been acquired. Loreto emailed Tolentino and apologized for mentioning the patio in the interview. He explained that he had told the reporter that the city still owned the land, "so it was still uncertain." Loreto stated, "I have been assured that we will have an outdoor patio, so I didn't think I had stepped on any

toes * * *." He explained, "no one told me not to talk about the patio until this morning." He further said, "I'll go to any meeting you need me to go to and plead my case!!!"

**{¶43}** Tolentino emailed Loreto back and explained that "anything regarding the patio need[s] to remain quiet to help us gain support from community council to purchase the alley. * * * We are doing everything we can to gain the alley and hope to have the community on our side. We hope to open in the early fall."

**{¶44}** Cintrifuse's efforts to acquire the park continued through June. Betts emailed Gelter on June 3, indicating that he wanted to lease the space to Cintrifuse, but needed to talk to the city manager and the CRC board first. Gelter sent Betts a draft of a proposed lease on June 9. Betts discussed the idea with Dan Jones of CRC and Jones provided him the appraisal value from three years prior and recommended that a new appraisal be done before the lease was discussed with the legal department.

**{¶45}** On June 17, 2016, Tolentino emailed Ron Novak and Alex Dever of Drawing Dept, an architectural firm. Tolentino copied Loreto on the email. The email said: "Ron/Alex we are planning to move forward with the patio construction. We will need information on the sizing of the pad etc. As well as something for the fence design. Please let me know what questions you may have."

**{¶46}** On July 5, Danny Lipson of 3CDC emailed Betts for an update on Imagination Alley. At a CRC meeting on July 19, Betts indicated that the proposed lease from Cintrifuse was with the legal department for review. On July 29, Lipson emailed Betts regarding the details of the lease/purchase. He told Betts that 3CDC was "happy to buy it [at] appraised value now or at that value in 5 years."

**{¶47}** On September 1, Betts sent an email to Dan Jones of CRC indicating that

he would place a call later that day to Martha Good, at that time the president of OTRCC, to discuss Imagination Alley. On September 20, Betts received the appraisal from the legal department. Lipson followed up multiple times, and on September 29, Betts sent Lipson two options: (1) sale of the park at the "fair market value" of $245,000 or (2) lease with an annual rate at the "fair market value" of $16,000.

{¶48}  On October 18, Betts discussed Imagination Alley at a CRC meeting. According to the meeting minutes, Betts requested a one-year extension of the short-term lease to Cintrifuse and discussed the possible sale of Imagination Alley. On November 3, Betts emailed Sheila Hill-Christian of the city manager's office. He said that CRC was working with 3CDC and OTRCC on issues related to the displacement of community artwork in the park, and that once those issues were resolved CRC intended to sell the land to 3CDC at market value.

{¶49}  On January 19, 2017, Gelter attended an OTRCC board of trustees meeting and presented an update on Imagination Alley. According to the minutes, 3CDC was interested in leasing or buying the park "with a commitment to keep it as a public space." On January 23, 2017, Gelter attended an OTRCC member's meeting to discuss Imagination Alley. A working group was created between CRC, OTRCC, 3CDC, and Cintrifuse to develop ideas for "improvement and solutions" for the park.

{¶50}  By March 2017, Betts had reconsidered his willingness to sell the park. On March 17, 2017, Betts emailed Gelter to tell him, "We can come to an agreement on extended lease. Let's talk on Monday."

{¶51}  OTRCC scheduled two public meetings on May 17 and May 24, 2017, to gather community input regarding Imagination Alley. By that point, 3CDC had indicated that it was okay with only acquiring a portion of the park. CRC presented the

attendees with four options to vote on: (1) CRC would maintain the site in its current condition; (2) CRC would sell or lease part of the site with the proceeds used to improve CRC property at Imagination Alley; (3) CRC would sell or lease the entire site, with the proceeds used to improve other CRC sites in Over-the-Rhine; (4) CRC would keep the site and redevelop the space for "requested uses." CRC tabulated the voting results from both meetings.

{¶52} Option one was supported by 11 people, option two was supported by 14 people, no one supported option three, and option four was supported by 16 people.

{¶53} CRC also sought community input using surveys. The surveys indicated a preference for keeping the space public, but there was some support for a mixed public/private option: 149 in favor of public, 11 in favor of private, and 79 in favor of a combination of public and private.

{¶54} Based on the results of the surveys and the votes cast at the May 17 and May 24 meetings, CRC decided to retain control of Imagination Alley and keep it as a public park.

{¶55} Things went relatively quiet for a while. On January 3, 2019, Gelter emailed Betts and attempted to reopen the discussion about Imagination Alley. This time, 3CDC sought only a "small patio area" for Panino. CRC was skeptical but recommended that the matter go back before OTRCC. Loreto testified that on May 20, 2019, he, his parents, and two local supporters attended an OTRCC meeting. Loreto testified that nobody from 3CDC was present. Loreto described the meeting as "verging on violent" resistance to any changes to Imagination Alley. A month after the meeting, OTRCC sent a letter to CRC. The letter stated, "Our community remains committed to the proposition that **all of Imagination Alley shall remain a public**

**space open to all residents** * * *." (Emphasis in original.)

IV. **Disputes as to Best Efforts**

{¶56} Appellants argue that there are several examples of Cintrifuse failing to use its best efforts. We will focus on two of their arguments.

{¶57} At the July 29, 2020 replevin hearing, Appellants offered into evidence an excerpt of a recording of a conversation that took place on December 18, 2018, between Gelter, Zurick, Loreto, Remo Loreto, and Loreto's business partner Joe Helm, where the parties discussed the status of the land for the patio. During that meeting, Gelter stated:

> I think it's probably a little more complicated than that because part of the issue is that in order to build the patio, one of us would have to invest a whole lot more money into it to build it. And I think, you know, our, going back and looking at it, you know, that was the bigger driver. Like, we still could, we still can and could plow through the city and get access to some space and I'm confident that we could do it, just like you said, it doesn't have to be exactly like what you're describing, but I can, yes, it's a fair point, if we needed to do that, we could. But at the time, you know, the budget came back, especially, you know, the money that we accumulated putting in, for the rent that we were getting back, you know, we, there wasn't any money, and you guys didn't have the money to do it, so we didn't have the money to build the patio.

{¶58} Gelter testified that the recording was taken out of context. He testified that he was referring to the fact that if Cintrifuse acquired the land, Panino would have to construct the patio at its own expense, and it did not have the money to do that. He

testified that Cintrifuse had the funds to acquire the land, but that it would not have mattered because Panino did not have the money to build the patio. Gelter testified that money was not the obstacle. The obstacle was that the city did not want to sell the park.

{¶59}  This is a dispute of material fact. There are multiple ways to interpret what Gelter meant by "we still could, we still can and could plow through the city and get access to some space and I'm confident that we could do it, * * * but * * * there wasn't any money, and you guys didn't have the money to do it, so we didn't have the money to build the patio." Viewing the evidence in the light most favorable to Appellants, a reasonable person could interpret Gelter's statements as evidence that Cintrifuse had the ability to buy or lease the land, but chose not to do so, either because it did not want to spend the money or because it determined that even if it acquired the land, Panino would not have been able to build the patio. If the fact-finder adopted this view of Gelter's statements, it might conclude that by failing to carry through on that ability, Cintrifuse did not exercise its best efforts to acquire the land for the patio.

{¶60}  Also, 3CDC indicated to OTRCC and representatives of the city several times throughout 2015-2017 that it was committed to keeping Imagination Alley open to the public. For example, such representations were recorded in the meeting minutes from the OTRCC meeting on October 12, 2015, in Gelter's email to Carter on October 15, 2015, and in the meeting minutes from the OTRCC meeting on January 19, 2017. It was also implied in the drawing of Imagination Alley discussed at the OTRCC meetings on November 23, 2015, and January 25, 2016. The trier of fact could conclude from 3CDC's repeated representations that the park would remain open to the public that neither 3CDC nor Cintrifuse was working diligently to acquire space in

the park for the private patio/bar of its lessee restaurant. Thus, there is genuine debate as to the reasonable efforts undertaken by Cintrifuse and 3CDC to push for private use of the park.

**{¶61}** Cintrifuse is a commercial landlord and subsidiary of 3CDC, a sophisticated development corporation that has handled many major development projects in Cincinnati. Whether Cintrifuse has met its best-efforts obligation is a question of fact as to whether Cintrifuse has put forth the diligence and reasonable effort to be expected of a corporation with its skills and resources, taking into account the standards of the commercial leasing industry. In evaluating such a question on summary judgment, we conclude there are genuine disputes of material fact both as to what efforts Cintrifuse and 3CDC actually expended, as well as what additional steps they might reasonably have taken under the circumstances.

**{¶62}** Given the nature of a dispute over whether a party has satisfied its best-efforts obligation and the disputes of material fact present in the record, the trial court erred in granting summary judgment in favor of Cintrifuse and 3CDC. Appellants' first assignment of error is sustained.

## Appellants' Second Assignment of Error

**{¶63}** In their second assignment of error, Appellants contend that the trial court erred in granting summary judgment in favor of Cintrifuse and 3CDC on Appellants' claim for fraudulent inducement. Appellants argue that 3CDC fraudulently induced Loreto into signing the lease by not telling him about the OTRCC opposition to the patio before he signed the lease.

**{¶64}** The elements of a fraudulent-inducement claim are:

(1) an actual or implied false representation concerning a fact or, where

there is a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (3) intent to induce reliance on the representation; (4) justifiable reliance; and (5) injury proximately caused by the reliance.

*Fannie Mae v. Hirschhaut*, 1st Dist. Hamilton No. C-180473, 2019-Ohio-3636, ¶ 30.

**{¶65}** Appellants admit that 3CDC owed them no duty to disclose. But they argue that 3CDC was aware of substantial community opposition to the patio, and that by not disclosing that to Loreto, 3CDC implied that there was no substantial opposition. Appellants contend that this was an "implied false representation."

**{¶66}** Specifically, Appellants claim that Gelter's testimony shows that he was aware of community opposition to any alcohol sales in the park. However, Appellants did not provide a record citation for such testimony, and we have not found any evidence to support such a claim in either Gelter's deposition or his testimony at the replevin hearing.

**{¶67}** Appellants also argue that Palazzolo implied there was no strong community opposition when, in projecting Panino's financial prospects, he included revenue from the patio, which was higher than Loreto's own revenue projections. On February 1, 2016, Palazzolo emailed Loreto with information regarding current tenant sales at other Cintrifuse locations and his projection for Panino's possible sales. The email stated:

Our current Tenant sales are as follows:

The restaurants range from $600/square foot to $2,038/square foot. We believe that a conservative estimate would [be] $950/square foot.

24

However, based on your concept being the only one of its kind in the neighborhood and the fast-casual set-up we think you can do upwards of $2,000/square foot in sales.

{¶68} Nowhere in the email does Palazzolo indicate that his numbers are based upon the patio being approved. Appellants argue that was implied where Palazzolo said that Panino was "the only one of its kind in the neighborhood." Gelter testified that other Cintrifuse/3CDC restaurants have patios. Moreover, even if Palazzolo assumed that the patio would be approved, he was making financial projections, not discussing the likelihood that the patio would be built.

{¶69} Finally, the lease that Loreto signed did not include the patio.

{¶70} Appellants have failed to demonstrate that any agent of 3CDC made an implied false representation about community opposition in order to mislead Loreto into signing the lease. In fact, the evidence shows that before the lease was signed, 3CDC believed a purchase of Imagination Alley would be approved by CRC. Therefore, the trial court did not err in granting summary judgment in favor of Cintrifuse and 3CDC on Appellants' fraudulent-inducement claim. The second assignment of error is overruled.

**Appellants' Third Assignment of Error**

{¶71} In their third assignment of error, Appellants argue that the trial court erred in granting summary judgment in favor of Cintrifuse and 3CDC on their fraud claim.

{¶72} The elements of fraud are:

(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with

knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading  another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Meehan v. Mardis*, 2019-Ohio-4075, 146 N.E.3d 1266, ¶ 19 (1st Dist.).

{¶73} Appellants argue that 3CDC committed fraud when Susan Tolentino copied Loreto on an email to Drawing Dept on June 17, 2016, and stated, "we are planning to move forward with the patio construction." Appellants claim that Loreto relied on Tolentino's email as an assurance that the patio had been approved. Loreto testified in his deposition that Tolentino told him on May 3 not to discuss the patio until 3CDC had the support of the community to acquire the alley, and she told him that there was an OTRCC vote the next week. Therefore, Appellants claim that when Loreto received Tolentino's email stating that the planning for the patio construction was going forward, Loreto believed that the purchase of Imagination Alley had been approved.

{¶74} Loreto testified that he waited to pay the "construction contribution" until June 23, 2016, because he had been withholding that payment until he saw in writing that the patio construction was moving forward. That allegation was disputed in Tolentino's deposition when she averred that Cintrifuse received the check before sending the June 17 email in question.

{¶75} Regardless of the timing of the construction contribution check vis-à-vis Tolentino's email, Appellants' fraud claim fails on the third and fourth elements. Tolentino's email did not contain any false statements. 3CDC had not acquired

Imagination Alley at that point, but that would not prevent 3CDC from planning for the patio's construction. At that point in time, both parties were still optimistic that the land would be acquired.

{¶76} Appellants' third assignment of error is overruled.

### Cintrifuse's Cross-Assignment of Error

{¶77} In Cintrifuse's cross-assignment of error, it argues that the trial court erred in declining to award it damages for "build-out" and the liquor license expenses and attorney fees. Cintrifuse's assignment of error is moot based on our disposition of Appellants' first assignment of error.

### Conclusion

{¶78} Appellants' first assignment of error is sustained. Their second and third assignments of error are overruled. Cintrifuse's cross-assignment of error is mooted by our disposition of Appellants' first assignment of error. Cintrifuse's cross-appeal numbered C-220065 is dismissed as moot. In Appellants' appeal numbered C-220050, the judgment of the trial court is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion and the law.

Judgment accordingly.

**BERGERON, P.J.,** and **BOCK, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.